172

# CIRCUIT COURT OF FAIRFAX COUNTY

Modern Continental South

 v.

Fairfax County
Water Authority

February 9, 2006

Case No. (Law) 225019

BY JUDGE STANLEY P. KLEIN

This matter came before the court on the four remaining pleas in bar of owner, Fairfax County Water Authority (the Authority) to the amended motion for judgment filed by contractor, Modern Continental South (MCS).[1] MCS alleges that the Authority breached the parties' contract by refusing to pay it for work done at the Authority's insistence but not required by the Contract. Specifically, MCS contends that the Contract did not require it to install torque tubes in certain butterfly valves in the Filter Building on this project.

In its First Plea in Bar, the Authority argues that MCS's claim is barred because MCS failed to notify the Authority about an alleged conflict in the contract documents and drawings before proceeding with the work, as required by the Contract. In its Third Plea in Bar, the Authority asserts that the claim is barred because MCS failed to give notice of its claim at the time of the occurrence or the commencement of the relevant work, as required by the Contract and the Virginia Public Procurement Act (VPPA). In its Fourth Plea in Bar, the Authority contends that MCS did not comply with the five-day notice of protest requirement mandated by the Contract. Finally, in its Fifth Plea in Bar, the Authority claims that MCS waived its right to bring a claim regarding this dispute when it agreed to the provisions stipulated in Change Order 3 to the Contract.

After full consideration of the arguments presented and all of the applicable authorities, this court holds that MCS is barred from bringing its claim because it (1) breached the Contract by failing to notify the Authority about the conflicts in the contract documents and drawings prior to proceeding with the work; and (2) failed to give timely notice of its claim as required by the Contract and the VPPA. Therefore, this court sustains the First and Third Pleas in Bar. The court overrules the Second, Fourth, and Fifth Pleas in Bar. Because of other potential disputes relating to this project, the parties urged the court to explicitly rule on each of the issues in the pleas in bar, even if it sustained the first plea. The court has complied with this reasonable request of the parties.

---

[1] The Authority has seemingly abandoned its Second Plea in Bar, which asserted that MCS's claim must fail because MCS failed to proceed with the "changed work" without delay.

174

## I. *Background*

This dispute arises out of a March 23, 2000, contract between the Authority and MCS for the construction of a $109,000,000.00 water treatment plant, known as the Frederick P. Griffith, Jr., Water Treatment Plant (the Project). The contract documents relevant to this case consist of the Agreement, the General Conditions, the Specifications, the Supplementary Conditions, the Contract Drawings (collectively the Contract Documents), and particular change orders, Change Order # 1 (CO1) and Change Order # 3 (CO3). See Joint Stipulation of Facts (JSF) ¶ 16. The controversy centers on the requirements for the construction of certain valves in the Filter Building. The parties agree that the Contract called for MCS to construct fourteen 42 inch Backwash Drain valves and fourteen 36 inch Filter Influent valves (collectively the Filter Butterfly Valves) in the Filter Building. See JSF ¶ 4. They disagree, however, whether the mechanisms operating the valves were to be extension stems, as claimed by MCS, or torque tubes, as claimed by the Authority.

On May 10, 2000, the Authority issued its Notice to Proceed for MCS to commence its work on the Project pursuant to the Contract. See JSF ¶ 2. Between July 2000, when MCS sub-contracted with M & H Valve Company to install the Filter Butterfly Valves, and March 2002, MCS presented to representatives of the Authority four submittals for the installation of the Filter Butterfly Valves as well as a Request for Clarification (RFC 312). Each of theses documents called for the use of extension stems. See JSF ¶¶ 13, 14. In March 2002, M & H Valve Company, MCS's subcontractor, began furnishing valves with extension stems. See JSF ¶ 16.

After MCS commenced the installation of the Filter Butterfly Valves, field inspectors of the Authority's engineer, Black and Veatch, Inc. (Black and Veatch), noted that the installation of the gear boxes on the Filter Butterfly Valves was creating potential problems for future valve repairs and maintenance. See JSF ¶ 17. As a result, employees of Black and Veatch reviewed the original Contract Drawings on May 3, 2002, at the request of the Authority, and advised the Authority in writing that the drawings required torque tubes, not extension stems, for the Filter Butterfly Valves. See JSF ¶ 18, Exh. 12. Consequently, on May 7, 2002, the Authority forwarded Black and Veatch's May 3, 2002, letter to MCS as a "Record Copy" of the Butterfly Valves Submittal. See JSF ¶ 20. Additionally, during the same time frame, the Authority notified representatives of MCS that torque tubes were in fact required for the Filter Butterfly Valves. See JSF ¶ 19.

In late June 2002, the parties executed CO3. See Exh. 3. Among other things, CO3 called for MCS to be paid an additional $133,283.00. In CO3, MCS agreed that it would not make any claims pursuant to the General Conditions of the Contract for the period ending June 7, 2002, except pursuant to certain Requests for Change Proposals (RCP) delineated in CO3. No reference was made to the Filter Butterfly Valves in any of the listed RCPs.

At a meeting during the summer of 2002, representatives of MCS requested compensation for the claimed "extra work" it was performing on the Filter Butterfly Valves to replace the extension stems with torque tubes. In response, the Authority withheld part of a payment due to MCS because of MCS's failure to have installed the torque tubes. In September 2002, Frederick Thompson, then MCS's project manager on the Project, became involved in the discussions concerning the valve issue. Between September 2002 and May 2003, additional conversations took place between representatives of the Authority and representatives of MCS concerning the Filter Butterfly Valve issue. While making it clear that MCS believed that the installation of torque tubes would constitute a change to the Contract, the representatives of MCS proposed alternative ways of operating the valves, which included both torque tube and extension stem options. See JSF ¶¶ 21, 23. Steve Weisberger, the Authority's Resident Engineer in Charge of Construction (REICC), asked MCS on multiple occasions to explain in writing why torque tubes were not required pursuant to the Contract. At no time during these discussions did the Authority ever agree to change its position on this issue and issue a change order. See JSF ¶ 23.

Eventually, on May 23, 2003, the Authority issued a non-compliance notice to MCS (NCN 187) officially informing MCS that its installation of the extension stems, instead of the torque tubes, was in contravention of the Contract between the parties. See JSF ¶ 26. MCS nonetheless continued to attempt to convince the Authority to change its position and by letter dated October 17, 2003, MCS requested that the Authority either "reconsider" its decision on the Filter Butterfly Valves issue or issue an RCP for a change to the Contract authorizing additional payment to MCS. See Exh. 26. On January 15, 2004, Chris Triolo, the Authority's project manager for the Project, advised MCS in writing that the Authority was denying MCS's request for additional compensation for the claimed "extra work" it was required to undertake to install the torque tubes. See Exh. 29. Nineteen days later, on February 3, 2004, MCS submitted, for the first time, a Notice of Claim and Request for Final Decision concerning the Filter Butterfly Valves issue. See Exh. 31. Thereafter, on February 12, 2004, within the ten-day window set out

in the Contract Documents, Weisberger issued the Authority's Final Decision denying MCS's claim. See Exh. 32. The letter embodying the Final Decision was hand delivered to representatives of MCS at a progress meeting that day. See JSF ¶ 30. Frederick Thompson was present at that meeting. See *Id.* By letter dated February 20, 2004, Thompson advised the Authority that MCS would proceed to finish the installation of the torque tubes and the assembly of the Filter Butterfly Valves under protest. See Exh. 34. The parties have failed to resolve this dispute. As a result, MCS timely filed the instant action within the applicable six month statutory limitations period.

## II. *Analysis*

A plea in bar is a "defensive pleading that reduces the litigation to a single issue." *Cooper Industries v. Melendez,* 260 Va. 578, 590, 537 S.E.2d 580, 594 (2000) (citations omitted). If proven, it "creates a bar to the plaintiff's right of recovery." *Id.* The moving party bears the burden of establishing the truth of the factual issue that validates the plea. *Weichart Co. v. First Commercial Bank,* 246 Va. 108, 109, 431 S.E.2d 308, 309 (1993).

The Contract provides in part the following:

> Contractor shall verify all dimensions, quantities, and details shown on the Drawings and Supplemental Drawings, equipment, material, finishes, and other such listings or other data received from the Engineer, and shall notify him of all errors, omissions, conflicts, and discrepancies. This shall not relieve the Contractor of full responsibility for unsatisfactory Work, faulty construction, or improper operation resulting therefrom, or from rectifying such conditions at his own expense. He shall not be allowed to take advantage of any errors or omissions. . . . The Contractor shall assume all responsibility for the making of estimates of the size, kind, and quality of materials and equipment included in work to be done under the contract.

(Exh. 1, Gen. Req't Art. 1.9(A) at 1110-5 to 1110-6.) This section creates a duty for MCS to verify the Contract Drawings and to notify the Authority of any errors, omissions, conflicts, or discrepancies. Furthermore, this section clearly states that MCS cannot take advantage of errors or omissions. The Contract also requires as follows:

> If the Contractor finds a conflict, error, ambiguity, or discrepancy in the Contract Documents, *he shall immediately call it to the attention of the Authority* . . . and to the Engineer in writing *before proceeding with the Work affected thereby.* The Authority will promptly resolve the matter in writing. *Work performed by the Contractor after issuance of the Notice to Proceed and prior to written resolution thereof by the Authority shall be performed at the Contractor's risk.*

(Exh. 1, Art. 3(A)(2) at 00700-6 (emphasis added).) This section creates a duty for MCS to advise the Authority of any conflicts, errors, ambiguities, or discrepancies it finds. Thus, these two contractual provisions, when read together, place the responsibility squarely on MCS to review and verify the details shown on all of the Contract Documents and to notify the Engineer in writing of any conflicts, errors, omissions, or discrepancies in the Contract Documents prior to commencement of the work. The Contract Documents explicitly establish that work performed by MCS prior to resolution of such an issue would be at its sole risk.

A. *The First Plea in Bar*

In its First Plea in Bar, the Authority contends that MCS's claim is barred because MCS failed to notify the Authority about the alleged conflict in the Contract Documents concerning the Filter Butterfly Valves before proceeding with this work, as required by the Contract.

MCS presents three arguments in response to the First Plea in Bar: (i) that the Contract Documents clearly called for the use of extension stems rather than torque tubes in the Filter Building; (ii) that, although MCS did have the duty to verify details in the Contract Documents, this duty did not require it to find every design error and did not shift the risk of errors in the Contract Drawings to MCS; and (iii) that even if MCS did breach a duty to verify the details, the remedy should not be a waiver of its entire claim. See Plaintiff's Brief in Opposition to Defendant's Plea in Bar, p. 6. The court will address each of these arguments.

178

(1) *Whether the Contract Documents Clearly Called for Extension Stems*

MCS asserts that, at the time it commenced the Filter Butterfly Valve work, it had concluded that the Contract Documents clearly called for extension stems and, therefore, it did not have any reason to notify the Authority of any conflicts. MCS argues that nowhere in the Contract Specifications was there any mention of torque tubes. Further, MCS contends that, between September 2000 and July 2001, it presented to the Authority and Black and Veatch four submittals for installation of the Filter Butterfly Valves with extension tubes, not torque tubes. On no occasion during that time frame did either the Authority or its Engineer bring up the subject of torque tubes and, in August of 2001, the Authority approved, as noted, a submittal for the use of extension stems with floor stands to operate the Filter Butterfly Valves. See Exh. 9. In addition, on September 6, 2001, the Authority responded to RFC 312 by modifying the placement of floor openings in the Filter Building to accommodate the use of extensions stems. See Exh. 10. As a result, MCS argues that the Contract Documents and the course of dealing of the parties establish that extension stems were clearly called for to actuate the Filter Butterfly Valves and that MCS therefore did not breach the terms of the Contract by failing to verify the Drawings or by installing extension stems.

Although the evidence adduced at the hearing on the pleas in bar supports each of the underlying facts posited by MCS, other credible evidence presented at the hearing belies the argument advanced by MCS. Initially, Contract Drawing DM-24 specifically references "Torque Tube (TYP)" for one of the 42 inch Butterfly Valves. See Exh. 3. The parties agree that the notation "TYP" is standardly used in the industry and denotes that what is represented is to be applied to other areas of a similar nature. "TYP" means typically. The reference to torque tube would therefore seemingly apply to all of the Filter Butterfly Valves. Indeed, contrary to MCS's argument that the parties' course of dealing on this issue leads to the clear conclusion that no torque tubes were called for in the Filter Building, in September 2002, Rick Vroom, MCS's Mechanical Project Engineer for the Project, sent an e-mail to representatives of the Authority and Black and Veatch in which he acknowledged that, pursuant to MCS's interpretation of the Contract Documents, torque tubes "are required for all the 42" Filter Backwash drain valves." See Exh. 21, p. 1. This e-mail was in direct response to the Authority's May 8, 2002, notification to MCS that torque tubes were required for each of the Filter Butterfly Valves. The fact that MCS may have later

retreated from this position during this dispute does not enhance its position that there are no errors, omissions, conflicts, or discrepancies in the Contract Drawings. See Exh. 1, p. 0110-5.

The location of the torque tube in DM24 provides further support for the Authority's position that torque tubes, not extension stems, were required for these valves. In this drawing, the tube is centered directly over the valve, thereby necessitating the construction of a sleeve through the concrete slab directly over the valve. The evidence establishes, and MCS does not contest, that this alignment of the sleeve is consistent with the utilization of torque tubes and inconsistent with the use of extension stems. (To utilize extension stems, a gearbox would have to be submerged, to the side of the valve, thereby requiring the construction of a sleeve through the concrete that was offset from the centerline of the butterfly valve.) MCS further argues that the Authority's position that the Contract Documents were, at least, in conflict rested solely on DM24. However, contrary to MCS's argument, other Contract Drawings depict the sleeve in the concrete slab in the same mid-center position over the valve shown in DM24. See Exh.s 7, 7(a), 7(b), 7(c), 7(d), 8, 8(a).

Nor is the failure to specifically mention torque tubes in the Specifications determinative. In fact, the General Requirements of the Contract between the parties belie that position:

> Contract Documents *Complementary: All work* called for in the Contract Documents applicable to this Contract, but not shown in the Drawings in their present form, or *shown in the Drawings and not specifically called for in the Specifications, shall be of like effect as if shown or mentioned in both.* Work not specified in either the Drawings or in the Specifications, but involved in carrying out their intent, or in the complete and proper execution of the Work, is required, and shall be performed by the Contractor as though it were specifically delineated or described.

(Exh. 1, Gen. Req't Art. 1.5 at 1110-3 (emphasis added).) Thus, pursuant to the Contract Documents themselves, the reference to torque tubes in the Drawings is deemed to be included in the Specifications also.

The Contract Documents further contradict MCS's argument that it was entitled to rely on the Engineer's review of its submittals. Section 1.6.02 of the General Requirements reads as follows:

**Engineer's Review of Submittals.** Engineer's review of submittals will cover only general conformity to the Drawings and Specifications, external connections, and dimensions which affect the layout. Engineer's review does not indicate a thorough review of all dimensions, quantities, and details of the material, equipment, device, or item shown. *Engineer's review shall not relieve Contractor of Contractor's sole responsibility for errors, omissions, or deviations in the drawings and data, nor of Contractor's sole responsibility for compliance with the Contract Documents.*

(Exh. 1, Art. 1.6.02 at 1300-4 (emphasis added).) As such, MCS had an affirmative duty in its submittals to "verify compliance with the Contract Documents" and to identify "all deviations from the Contract Documents;" however, none of the submittals satisfied this requirement. See Exh. 1, Gen. Req't, Art. 1.6.01 at p. 01300-2-01300-3. Nor is MCS's reliance on the response to RFC 312 persuasive. The language of the Contract itself belies any claim that MCS could assert reliance on RFC 312 as a basis for its failure to comply with the terms of the Contract. Article 1.8 of the General Requirements states in relevant part:

*Failure of the Authority* or its authorized Representatives *to ascertain noncompliance or to notify the Contractor of any noncompliance shall not relieve the Contractor from fulfilling his obligations* under the terms and conditions *of the Contract Documents.*

(Exh. 1, Gen. Req't, Art 1.8 at 01400-7 (emphasis added).) Additionally, section SC-17 of the Contract's Supplementary Conditions states that:

The Contractor's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. *None of the following will constitute an acceptance of Work that is not in accordance with the Contract Documents:*
 a. observations by the Engineer. . . .
 e. any acceptance by the authority or any failure to do so;
 f. any review of a Shop Drawing or sample submittal or the issuance of a notice by the Engineer.

(Exh. 1, Gen. Req't, Art. 17, Special Condition SC-17 at 00800-12 (emphasis added).)

In actuality, the Contract Documents considered as a whole belie any claim that use of extension stems is the only possible conclusion as to the control to be utilized in the Filter Butterfly Valves and that the Contract Drawings therefore do not contain "errors, omissions, conflicts, or discrepancies." Indeed, in its corporate deposition, MCS basically conceded this point when its designee Don Breda testified that the reference to "torque tube typical" in DM24 was an "error." See June 6, 2005, transcript, p. 238. This court finds by the greater weight of the evidence that there was, at a minimum, an error in, or conflict between, the Contract Drawings and the Contract Documents concerning the construction of the Filter Butterfly Valves. Hence, MCS's position that the Contract Documents clearly called for extension stems, not torque tubes, for the Filter Butterfly Valves is not persuasive.

(2) *Whether the Plaintiff Contractually Bore the Risk for Finding and Reporting the Errors or Conflicts in the Contract Drawings*

It is axiomatic in Virginia that it is the function of courts to construe contracts made by parties, not to rewrite contracts for them. *Graphic Arts Mutual Ins. v. Warthen Co.*, 240 Va. 457, 460, 397 S.E.2d 876, 878 (1990); *Magann Corp. v. Electrical Works*, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962). Courts are bound to conclude that parties intend what their written contracts plainly declare. *Magann Corp*, 203 Va. at 264, 123 S.E.2d at 381. Courts are not authorized to insert, for the benefit of either party, terms not set out in their contract. *Lansdowne Dev. Co. v. Xerox Realty*, 257 Va. 392, 400, 514 S.E.2d 157, 161 (1999); *Bridgestone/Firestone v. Prince William Square*, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995). When interpreting any part of a contract, courts must construe the contract as a whole. *Lansdowne Dev.*, 257 Va. at 401, 514 S.E.2d at 161; *Vega v. Chattan Assoc.*, 246 Va. 196, 199, 435 S.E.2d 142, 143 (1993). Indeed, the law presumes that parties have not needlessly inserted words or provisions into their contracts and that all words contained in a contract must be given effect if it is reasonably possible to do so. *Ames v. American Nat. Bank*, 163 Va. 1, 38, 176 S.E. 204, 216-17 (1934); see also *Winn v. Aleda Const. Co.*, 227 Va. 304 at 307, 315 S.E.2d 193 at 194 (1984); *Barrett v. Vaughan & Co.*, 163 Va. 811, 817, 178 S.E. 64, 68 (1935). No word or provision in a contract will be treated as meaningless, if a reasonable construction can be given to it. *Winn v. Aleda Const. Co.*, 227 Va.

304, 307, 315 S.E.2d 193, 194 (1984); *Barrett*, 163 Va. at 817, 178 S.E. at 68. Thus, courts must enforce contracts as written, and a contract "becomes the law of the case unless the contract is repugnant to some rule of law or public policy." *D. C. McClain, Inc. v. Arlington County*, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995); *Mercer v. South Atlantic Ins. Co.*, 111 Va. 699, 704, 69 S.E. 961, 962 (1911). It is with these fundamental tenets of Virginia jurisprudence in mind that this court must analyze the position of the parties on this sub-issue.

The plain and unambiguous language of the Contract herein stated that "Contractor shall verify all . . . details shown on the Drawings . . . and shall notify [the Engineer] of all errors, omissions, conflicts, and discrepancies." See Exh. 1, Gen. Req't, Art. 1.9(A) at 1110-5-1110-6. Nonetheless, MCS neither verified all details shown on the Drawings nor notified the Authority of all errors or conflicts. The Contract further provided any such verification and notification would "not relieve the Contractor of *full responsibility* for unsatisfactory work, faulty construction . . . or from *rectifying such conditions at his own expense*. He shall not be allowed to take advantage of any errors or omission. . . . The Contractor *shall assume all responsibility* for the making of estimates of the . . . kind . . . and quality of . . . equipment included in work to be done under the Contract." See *id*. (emphasis added). The Contract further mandated that, upon finding a conflict or error, MCS was required to "immediately call it to the attention of the Authority . . . and to the Engineer in writing before proceeding with the work affected thereby." See Exh. 1, Art. 3(a)(2) at 00700-6. The Contract specifically read that work performed by the contractor "prior to written resolution thereof by the Authority, shall be performed at the Contractor's risk." See *id*. When interpreting these provisions of the Contract, the court must construe them as part of the contract as a whole. See *Lansdowne Dev.; Vega, supra*. The provisions must be read in conjunction with each other, and together they establish the affirmative responsibilities of MCS. When these provisions are read in conjunction with all the Contract Documents, the clear intent of the parties, as expressed by the words in their Contract, was that MCS was contractually responsible for finding and reporting to the Authority the errors and conflicts in the Contract Documents relating to the Filter Butterfly Valves. As such, MCS was fully responsible, at its own expense, for rectifying the problems that resulted from its failure to comply with these terms of the Contract.

The decision of the Supreme Court of Virginia in *D. C. McClain v. Arlington County* further supports this court's conclusion that the ultimate responsibility for the errors in the Contract Documents and the risks associated

therewith remained with MCS, the contractor. *D. C. McClain v. Arlington County*, 249 Va. 131, 452 S.E.2d 659 (1995). In *D. C. McClain*, the contractor entered into an agreement with Arlington County to construct a bridge. *Id*. at 133, 452 S.E.2d at 660. The following provisions of the construction contract at issue in that case bear great similarity to the relevant provisions of the Contract here:

> Review of this document is for conformance with the design concept of the project only. Contractor is responsible for confirming field dimensions, for information that pertains solely to the fabrication processes or to techniques of construction, and for coordination of the work of all trades. *This review does not relieve the contractor from complying with all requirements of the contract documents. . . .*[2]
>
> The Engineer shall pass upon the shop drawings with reasonable promptness. Checking and/or approval of shop drawings will be general, for compliance with the information given in the Contract Documents, and will not include quantities, detailed dimensions, nor adjustments of dimensions to actual field conditions. *Approval shall not be construed as permitting any departure from contract requirements . . . nor as relieving the Contractor of the responsibility for any error in details, dimensions, or otherwise that may exist. . . .*
>
> The Contractor shall carry out the Work in accordance with the Drawings and Specifications. The measurements and dimensions shown on these drawings shall be verified at the site by the Contractor. The contractor shall be responsible for all dimensions and coordinated execution of the Work. . . . *Where there are discrepancies in the contract documents [the Contractor shall] notify the Engineer before proceeding with the Work.*

*Id*. at 137-39, 452 S.E.2d at 663, 664 (emphasis added).

In *D. C. McClain*, even though Arlington County and its Engineer had signed off on an erroneous shop drawing that seemingly complicated construction to the detriment of the contractor, the Supreme Court observed

---

[2] This language was actually affixed to a stamp on a shop drawing after review by the Engineer.

that "the contract documents clearly state that [the contractor] remained responsible for any errors that might exist in the shop drawings." *Id.* at 138, 452 S.E.2d at 663. Applying the plain language of the contract at issue, the *D. C. McClain* Court held that the County's approval of the shop drawing did not relieve the contractor of its obligation to properly construct the bridge. *Id.*

Further, as to the verification of measurements issue, the *D. C. McClain* Court found that the contract clearly required the contractor to verify the measurements and dimensions set out in the drawing before commencing construction. *Id.* at 139-40, 452 S.E.2d at 664. There, as here, the contractor failed to do so. *Id.* at 140, 452 S.E.2d at 664. Reasoning that "had [the contractor] complied with the contract, the County would have had an opportunity to make the necessary changes before [the contractor] commenced work on the bridges," the Supreme Court upheld the trial court's ruling setting aside a judgment on behalf of the contractor. *Id.* at 140, 452 S.E.2d at 664. The same rationale applies here. Had MCS complied with its responsibilities pursuant to the Contract, the Authority could have corrected all errors and conflicts in the Contract Documents before MCS commenced construction on the Filter Building. Therefore, based upon the language employed by the parties in the Contract and the holding of the Supreme Court in *D. C. McClain*, this court rejects the argument advanced by MCS that it did not bear the ultimate risk of the errors in the Contract Documents concerning the Filter Butterfly Valves that it failed to discover and report to the Authority prior to commencing work.

### (3) *Whether the Appropriate Remedy Is to Bar the Claim*

Finally, as to the First Plea in Bar, MCS argues that, even if it did breach the Contract and, as a result, this court rules that MCS should bear the ultimate risk of the errors in the Contract Documents, barring MCS's entire claim in this case is not the proper remedy. Once again, the court finds that the position taken by MCS is inconsistent with the language of the Contract and the evidence presented at the hearing on the pleas in bar.

The Contract places the entire burden on MCS to find and point out errors, omissions, conflicts, or discrepancies. It specifically states that MCS cannot benefit from any errors or omissions and that MCS is fully responsible for unsatisfactory work, faulty construction, or improper operation resulting from errors, conflicts, omissions, or discrepancies *and for rectifying such conditions at its own expense.* See Exh. 1, Gen. Req't, Art. 1.9(A) at 1110-5-1110-6. Therefore, the Contract appears to clearly bar any claims by MCS for

damages arising out of errors, omissions, conflicts, or discrepancies in the Contract Documents and Drawings.

Furthermore, MCS fails to present any potential alternative remedy to the barring of its claim. Indeed, the only plausible remedy for MCS's breach of the Contract is that it should not recover damages arising from the "extra work" it performed subsequent to its failure to notify the Authority of the conflicts, errors, or omissions in the Contract. In this lawsuit, MCS seeks to recover $578,808.00 plus attorney's fees and interest. See Motion for Judgment (MFJ) ¶ 47. This amount was calculated from the labor and materials that MCS claimed it had been forced to utilize in performing the "extra work" of installing torque tubes for the butterfly valves on or after May 8, 2003. See JSF. ¶ 25. Thus, MCS is not suing for any damages other than those arising from the "extra work" that it performed in the Filter Building.

When pared down to its basic essence, MCS's defense to the First Plea in Bar is that there was fault on both sides that led to the dispute over the Filter Butterfly Valves and that it is simply unfair to have MCS bear the entire brunt of the consequences that arose from the errors in the Contract Documents and Contract Drawings. As a result, MCS asks this court to ignore or rewrite provisions in the Contract. As part of the Contract, the Authority may well have bargained for, and in fact did receive, the benefit of placing on its contractor the entire risk of errors and conflicts in the Contract Documents. MCS bargained for and received the anticipated profit arising from a $109,000,000.00 contract to build a water treatment facility. In determining whether to bid on this project and the amount of the bid to submit, MCS was in a position to fully evaluate this issue and to determine the necessary cost to be incurred in order to obviate or minimize any such risk. Hence, MCS's position on the First Plea in Bar is not only inconsistent with longstanding Virginia law on the proper role of the judiciary in contract disputes, but it also fails to support any true injustice to MCS. Accordingly, for the reasons set out above, the First Plea in Bar is sustained and this matter is dismissed with prejudice.

## B. *The Third Plea in Bar*

In its Third Plea in Bar, the Authority contends that MCS failed to timely file a notice that it would be making a claim as a result of the Filter Butterfly Valves dispute, in contravention of both Virginia law and the Contract between the parties. MCS responds that (1) it provided timely notice

186

of its claim; and (2) the Authority has waived the defense that the notice of claim was untimely.

As with the analysis of the First Plea in Bar, the determination of the merits of the Third Plea in Bar is controlled by binding Virginia precedent and the terms of the Contract between the parties. Indeed, it cannot be questioned that the court's analysis of the Third Plea in Bar must begin with consideration of the relevant provisions of the Virginia Public Procurement Act (VPPA); Virginia Code § 2.2-4300, et seq.

The stated purpose of the VPPA "is to enunciate the public policies pertaining to governmental procurement from nongovernmental sources...." Va. Code § 2.2-4300. The parties agree that Virginia Code § 2.2-4363 of the VPPA applies to the analysis of this plea. That statute reads in relevant part as follows:

> Contractual claims, whether for money or other relief, shall be submitted in writing no later than 60 days after final payment. However, *written notice of the contractor's intention to file a claim shall be given at the time of the occurrence or beginning of the work upon which the claim is based....*
>
> Each public body *shall include in its contracts a procedure for consideration of contractual claims.* Such procedure, which may be contained in the contract or may be specifically incorporated into the contract by reference and made available to the contractor, shall establish a time limit for a final decision in writing by the public body. If the public body has established administrative procedures meeting the standards of § 2.2-4365, such procedures shall be contained in the contract or specifically incorporated in the contract by reference and made available to the contractor.

Va. Code § 2.2-4363(A), (B) (emphasis added).

Consistent with the mandate of Virginia Code § 2.2-4363(B), the Contract between the parties included the following notice of claim provisions:

> If the Contractor wishes to make a contractual claim, whether for extra compensation, damages or any other relief, he *shall give* the Authority notice in accordance with the provisions of paragraph 3.E.1 herein. The Contractor's *failure to comply*

*strictly* with the requirements of paragraph 3.E.1 *shall result in waiver of the claim.*

(Exh. 1, Art. 3(C)(1), at 0700-6 (emphasis added).)

> *If the Contractor is of the opinion that any Work required,* necessitated, or ordered *by the Authority,* or any action required or ordered by the Authority to be taken or not taken *violates the terms and provisions of this Contract,* he shall proceed with the Work without delay and *shall, within five days after commencing such Work or actions, notify the Authority in writing,* with a copy to the Engineer, *of his claim with respect thereto and request a final determination thereof.* In order to invoke the procedures of this section, the Contractor's request must (i) refer specifically to this section by number; (ii) in the case of the Authority, be hand-delivered in triplicate to the office of the REICC . . . and (iii) contain a full explanation of the basis of the Contractor's position and the rationale for its request.

(Exh. 2, CO1, at p. 2 of 9, amending Exh. 1, Art. 3(E)(1), at 00700-6 (emphasis added).)

It is undisputed that MCS first filed its notice of claim on February 4, 2004, almost nine months after it began the work which forms the basis of its claim in this lawsuit. Nonetheless, MCS presents three arguments in support of its contention that its claim notice satisfied both the VPPA and the Contract. First, it contends in a footnote on brief that "the notice of claim requirements were not triggered until MCS began to manufacture, deliver, and install the torque tubes." See Plaintiff's Brief in Opposition, p. 12, n. 16. MCS neither cites any authority nor presented evidence to support such a position, and it presents, at best, a strained reading of Virginia Code § 2.2-4363(A) and the relevant Contract provisions, especially in light of MCS's claim for compensation in this matter for work done from May 8, 2003, forward.

Second, MCS asserts that the Contract's change order procedures, rather than its claims procedures, are implicated here. This argument also fails because the Authority never issued or promised to issue a change order for the work to be re-done on the Filter Butterfly Valves. To accept MCS's argument would eviscerate the VPPA's obvious intent to have notices of claims presented at the time that the disputed work commences so that the public body can monitor the "extra work" or resolve the matter promptly with its

188

contractor. In effect, it would allow a contractor to forego putting a public body on notice of a claim until it had completed virtually all of the extra work, based solely upon a subjective hope that a change order might some day be issued by the owner. Such an interpretation is not only entirely inconsistent with the VPPA but also ignores the contractual provisions at issue here that required MCS to provide the Authority with notice of any such claim "within five days after commencing such work." This argument further fails because the notice was delivered more than five days after January 19, 2004, when MCS concedes that it received notification that no further compensation would be forthcoming. See Plaintiff's Brief in Opposition, pp. 9, 12.

MCS's third argument warrants greater consideration. This third argument is premised upon a theory that, by agreeing to Art. 3(E)(1) of the Contract, the parties had adopted a claims procedure as authorized by Virginia Code § 2.2-4363(B). MCS therefore asserts that Art. 3(E)(1) triggers the requirement of notice only when:

> the Contractor is of the opinion that any work required, necessitated, or ordered by the Authority or any action required or ordered by the Authority to be taken or not taken violated the terms and provisions of the Contract. . . .

Art. 3(E)(1). Hence, according to MCS, no notice was required to be given until the relevant personnel in MCS had formed the opinion that the Authority had violated the Contract. The court also rejects this argument.

On May 7, 2002, MCS was advised in writing that the Contract Drawings called for the installation of torque tubes, not extension stems, in the Filter Butterfly Valves. Thereafter, representatives of MCS embarked on a course of action to attempt to convince, cajole, and/or persuade the Authority to either accept the extension stems or to pay additional sums for the remedial work and torque tube installation. Notwithstanding the repeated efforts of MCS personnel, the Authority never wavered in its position that torque tubes needed to be installed. Indeed, on May 23, 2003, the Authority responded to MCS's requests not by issuing a change order, work order, or a Request for Cost Proposal, but instead by issuing NCN 187 which officially advised MCS that its work on the Filter Butterfly Valves was not in compliance with the terms of the Contract. Whereas the issuance of a change order, work order, or RCP could have supported an expectation of further compensation for the additional Filter Butterfly Valve work, the credible evidence at the hearing on

the pleas in bar established that an NCN meant that the work would have to be redone without payment of any additional compensation.

Thereafter, by letter dated October 17, 2003, MCS urged the Authority to "reconsider" its decision on the valves issue, but no reconsideration was forthcoming. To the contrary, on January 15, 2004, the Authority's project manager, Chris Triolo, again advised MCS, in writing, that a decision had been reached that torque tubes were required and explicitly notified MCS that no additional compensation would be forthcoming for the installation of the torque tubes. He included with his correspondence a letter of the same date from John Pruss of Black and Veatch explaining why this was so. Nonetheless, it was not until February 2, 2004, sixteen days after receipt of Triolo's transmittal, that MCS first filed a notice of claim. On brief, and at the hearing, MCS claimed that it was not until February 2, 2004, when the key personnel of MCS were on site, that MCS formed the opinion that the Authority's failure to pay for the extra work on the Filter Butterfly Valves violated the Contract. It simply strains credulity to believe that the MCS personnel reached that conclusion for the first time in early February 2004 – coincidentally within MCS's claimed five-day window for transmitting the notice – when it had been arguing for the preceding twenty-one months that the Authority was clearly mistaken on this issue. Indeed, in its February 20, 2004, Notice of Protest, MCS affirmatively represented that it had been performing the additional work on the Filter Butterfly Valves under protest for several months, thereby acknowledging that MCS had long since taken issue with the Authority's position on the valves question. The court finds it much more credible that, after receipt of the January 15, 2004, transmittal, MCS finally gave up any hope that the Authority might acquiesce to its requests to pay additional sums for the torque tube work. At that point, it elected to take an adversarial position *vis a vis* the Authority. Based upon all the evidence presented, this court finds by the greater weight of the evidence that the commencement of the work, pursuant to Art. 3(E)(1) occurred in all probability before May 8, 2003, and could not have occurred later than May 23, 2003.

Further, acceptance of MCS's third argument would require the court to ignore the express requirement in Art. 3(E)(1) that notice of a claim be given "within five days after commencing such work. . . ." Pursuant to Virginia law, however, this court must assume that the parties intended to give effect to each of the words and provisions included in their contract, if effect can reasonably be given to each of the words. See *Barrett v. Vaughan & Co.*, 163 Va. 811, 817, 178 S.E. 64, 68 (1935). In fact, such notice of claim

procedures are required to be included within the Authority's contracts under the VPPA. See Va. Code § 2.2-4363(B). Ignoring Contract section 3(E)(1) would not only serve to rewrite the Contract, in contravention of Virginia case law, but would also discount the express requirement of the General Assembly that contractors provide notice of claims as specified by the parties' contracts. Further, contrary to MCS's argument, requiring a notice of claim does not preclude parties from continuing to attempt to reconcile their positions. Instead, the notice of claim requirement serves as an official indication of opposing contract interpretations at the earliest possible time. To allow otherwise could potentially undermine the General Assembly's clear intent in enacting notice of claim requirements, thereby enabling contractors to unnecessarily lengthen both the time and costs associated with resolving disputes. Inclusion of the five-day notice provision within the Contract allows the Authority to efficiently manage the construction project by forcing prompt identification of potential disputes, thereby minimizing the chance of mistakes and the attendant unnecessary costs for both parties.

Finally, as to the Third Plea in Bar, the court rejects MCS's waiver argument. To establish waiver, a party must present "clear, precise, and unequivocal evidence . . . of an `intentional relinquishment of a known right'." *Stanley's Catering, Inc. v. Abramson*, 226 Va. 68, 74, 306 S.E.2d 870, 873 (1983). Contrary to MCS's position on brief, the REICC's Final Decision of February 12, 2004, did not waive the notice of claim defense. To the contrary, as argued by the Authority on brief, the REICC specifically articulated that his ruling made it "unnecessary to discuss [MCS's] compliance with *other* contractual requirements." See Exh. 32 (emphasis added). Therefore, MCS has failed to satisfy its burden of proof on its waiver claim. The Authority is further correct that the Contract bars such a finding of waiver. See Reply Brief of Defendant, p. 8.

Compliance with the procedures concerning the processing of contract claims under the VPPA is mandatory and "must be met in order for a court to reach the merits of a case." *Dr. William E. S. Flory Small Bus. Dev. Ctr., Inc. v. Virginia*, 261 Va. 230, 238, 541 S.E.2d 915, 919 (2001). Here, the evidence establishes that MCS failed to comply with the mandatory notice of claim requirements of both the VPPA and the Contract. Hence, MCS is barred from presenting evidence on the merits of its claim for additional compensation for the "extra work" performed on the valves in the Filter Building. Accordingly, the Third Plea in Bar is also sustained and this case is dismissed with prejudice for this additional reason.

C. *The Fourth Plea in Bar*

The Fourth Plea in Bar is based on the Authority's contention that MCS's claim is barred because it failed to file a "notice of protest" within the time frame set out in the Contract. See Exh. 2, CO1, at p. 2 of 9, amending Exh. 1, Art. 3(E)(1) at 00700-6. The Authority asserts that the Contract made time of the essence, that the five-day notice of protest requirement was not unreasonably short, and that there is no conflict between the five-day notice of protest requirement and the VPPA. MCS admits that its notice of protest was technically three days late. Nevertheless, it argues that (1) substantial compliance with the notice of protest provisions was sufficient; (2) that the five-day period for transmittal of the notice of protest was unreasonably short; and (3) that the VPPA does not empower the Authority to impose additional post-final determination hurdles to appeal an adverse claim decision.

The chronology of events informing the decision on this plea in bar is not contested. MCS's February 3, 2004, request for a final determination gave the Authority ten days to issue a written final determination. See Exh. 1, Art. 3(E)(1). The Authority made its final written determination that the "extra work" was required under the Contract on February 12, 2004, and the letter was received by MCS that day. See Exh. 32. MCS was then required under the Contract to give notice to the Authority that it was performing the work under protest. See Exh. 1, Art. 3(E)(1). The Contract called for the notice to be provided within five days, which would have required notice by February 17, 2004. *Id.* The notice was in fact provided on February 20, 2004, three days after the expiration of the five-day window. See Exh. 34.

(1) *Whether Time Was of the Essence for the Notice of Protest Requirement*

The Authority claims that time was of the essence under the terms of the Contract, including the notice of protest provision. MCS counters that substantial compliance was sufficient under the circumstances. Thus, there is an issue as to whether the notice was timely.

Under Virginia law, a court must "enforce the contract . . . as written, and the contract becomes the law of the case unless the contract is repugnant to some rule of law or public policy." *D. C. McClain v. Arlington County*, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995). To make time of the essence, the specific phrase "time is of the essence" does not necessarily have to be included; however, the intention must be clearly manifested from the

agreement as a whole. *Cranford v. Hubbard,* 208 Va. 689, 694, 160 S.E.2d 760, 764 (1968). In *Cranford,* for example, time was of the essence because it was material to the contract's performance. *Id.* Here, the Authority contends time is of the essence because of various "time is of the essence" provisions throughout the Contract (which are not related to notice) and because of the following provision:

> In order to reserve his right to claim compensation for such Work, or damages resulting from such compliance, the Contractor shall, *within five days* after receiving notice of the Authority's determination and direction, notify the Authority, in writing, that the Work is being performed . . . under protest. *Failure of the Contractor to so notify the Authority as provided herein shall constitute a waiver and release of the contractor's right to claim compensation.* . . .

(Ex. 2, CO1, at p. 2 of 9, amending Exh. 1, Art. 3(E)(1) at 00700-6 (emphasis added).) This provision not only specifically states that the notice shall be given within five days, but also mandates that failure to notify within that period shall constitute a waiver of any claims. This clearly manifests an intention to make time of the essence. One court has ably articulated the public policy supporting certainty of time requirements in such contracts:

> Making time of the essence is an effective, time honored tool of contract administration and enforcement. It provides certainty and objectivity in the definition of rights and obligations between contracting parties, particularly when it has been negotiated between the parties and expressly made a part of their agreement. The alternative is a date for performance which is subject to adjournment and, ultimately, to a test of reasonableness applied by a trier of fact. The effectiveness of making time of the essence is dependent upon the expectation and understanding of the parties that their negotiated agreement requiring performance on a specified day and at a specified time will be strictly enforced without resort to litigation to determine whether the defaulting party's non-performance should be excused. Judicial tampering with the parties' agreement emasculates this tool and promotes litigation instead of the certainty and objectivity sought by the parties.

*Gorrie v. Winters*, 518 A.2d 515, 517 (N.J. Super. Ct. App. Div. 1986). This court finds the New Jersey court's ruling extremely well-reasoned. Substantial compliance here was not sufficient. Hence, the transmittal of the notice of protest three days after the contractually mandated deadline was not timely.

(2) Whether the Five-Day Limit for Transmitting the Notice of Protest Was Unreasonably Short

Parties to a contract may agree to shorten time limits fixed by statute if the contractual provision is not contrary to public policy "and if the agreed time is not unreasonably short." *Board of Supervisors v. Sampson*, 235 Va. 516, 520, 369 S.E. 2d 178, 180 (1988). MCS contends that under the circumstances of this case, the five-day limit was unreasonably short and therefore unenforceable. This court notes that MCS argues that the five-day notice provision for transmittal of a notice of protest was unreasonably short but makes no such claim concerning the five-day limit provided for notice of claims under the same contractual provision. Various courts have addressed whether similar contractual provisions were enforceable.

In *Liquid Carbonic Co. v. Norfolk & W. Ry.*, the Supreme Court of Virginia held that a thirty-day contractual limit for damage claims against a common carrier of goods was reasonable and approvingly cited cases from other jurisdictions which upheld limits as short as three to five days. *Liquid Carbonic Co. v. Norfolk & W. Ry.*, 107 Va. 323, 326-27, 58 S.E. 569, 571 (1900) (citations omitted). Indeed, Chief Judge Michael P. McWeeny of this court has held that a five-day limitation for the transmittal of a notice of claim in a case falling under the VPPA was enforceable and the failure to timely file was dispositive. See *R. J. Crowley, Inc. v. Fairfax School Bd.*, 41 Va. Cir. 55 (1996). MCS argues, nevertheless, that this court should determine that the five-day notice of protest time limit was unreasonably short under the circumstances of this case. It argues (1) that there were numerous design problems with the Project which increased "the difficulty of managing administrative requirements" (see Plaintiff's Brief in Opposition, p. 18); (2) that MCS's Project Manager, William Thompson, was in California over the weekend before the notice of protest was due; (3) that the employee in charge of routing documents was also not on site for a portion of this period; and (4) that this occurred over a three-day holiday weekend. *Id.* These purported justifications for the untimely filing of the notice of protest ring hollow in the context of a $109,000,000.00 contract.

In actuality, there was no real justification for the untimely handling of the notice of protest. When MCS made its request for final determination on February 3, 2004, it knew that a response would be forthcoming within ten days and that any notice of protest would be due five days thereafter, as it referenced Art. 3(E)(1) in its February 3, 2004, letter. It received the Authority's decision on February 12, 2004, at a meeting attended by Mr. Thompson. Mr. Thompson could have prepared and submitted the notice of protest either before he left for California or through another employee while he was spending the holiday weekend in California. Moreover, he returned back from California the day the notice was due but, inexplicably, the notice of protest was still not submitted until three days later. Although it arguably may have been inconvenient for MCS to process this notice within the contractually established five-day window, inconvenience does not equate to unreasonableness. Thus, this court rejects the argument that the five-day notice of protest requirement was void as unreasonable. See *Board of Supervisors v. Sampson*, at 520, 396 S.E.2d at 180.

(3) *Whether the Notice of Protest Requirement Is Unenforceable As Violative of the Virginia Public Procurement Act*

Finally, as to the Fourth Plea in Bar, MCS argues that the five-day notice of protest requirement in the Contract contravenes the relevant claim appeal provision of the VPPA and is therefore unenforceable. The Authority responds (1) that nothing in Virginia Code § 2.2-4363(B) precludes a public body from adopting a contractual requirement such as a notice of protest; (2) that notice of protest provisions are "typical and commonplace"[3] in public construction contracts and are supported by important public policies; and (3) that, because there is no conflict between the VPPA and the contractual notice of protest provision implicated here, this court need not decide whether the six month statute of limitations imposed by the General Assembly for appeals of contract claims can be modified by contract. Here, the court agrees with MCS.

The VPPA created a scheme that certain public bodies must follow when obtaining goods or services from nongovernmental contractors. "This statutory scheme affords certain benefits to citizens of the Commonwealth, nongovernmental contractors, and governmental entities." *W. M. Schlosser Co. v. Board of Sup. of Fairfax*, 245 Va. 451, 455, 428 S.E.2d 919, 921 (1993). Indeed, the VPPA contains specific protections for governmental

---
[3] See Defendant's Brief in Support of Pleas in Bar, p. 18.

entities, nongovernmental contractors, and citizens of the Commonwealth. *Id.* at 455-56, 428 S.E.2d at 921. As a result of the balancing act undertaken by the Virginia General Assembly in its enactment of the VPPA, the Supreme Court has recognized that parties cannot by contract undermine the intent of the General Assembly in this legislation. As now Chief Justice Hassell articulated for the Court in *Schlosser*:

> Thus, it is clear that the Act is unique because, in the area of public procurement, the statutory scheme balances many competing interests and confers certain rights and obligations upon citizens of the Commonwealth, nongovernmental contractors, and governmental entities. Because of this unique scheme, *in the absence of explicit statutory authorization, certain rights cannot be waived by contract. If the Act were to be construed to permit a contractor or a governmental entity to waive certain rights, then these waivers might frustrate the goals that the General Assembly sought to achieve by enacting that Act.* Accordingly, we hold that, even though Schlosser executed a contract that permitted the county executive or his designee to hear Schlosser's administrative appeal, this contract could not vitiate Schlosser's right to a hearing before a disinterested person as required by former Code 11-71(A).

*Id.* at 456-57, 428 S.E.2d at 922 (emphasis added).

The VPPA states in relevant part as follows:

> The decision of the public body [denying the claim] *shall be final and conclusive unless the contractor appeals within six months* of the date of the final decision on the claim by the public body.

Va. Code § 2.2-4363(E) (emphasis added). Hence, "a contractor may *obtain a de novo determination* of its claim in the circuit court *provided it institutes legal action within six months* of the date of the final decision on the claim by the public body'." *Blake Constr. Co. v. Upper Occoquan Sewage Auth.*, 266 Va. 564, 569, 587 S.E.2d 711, 714 (2003) (emphasis added). Pursuant to Virginia Code § 8.01-246, the statute of limitations for actions *ex contractu* is generally five years for written contracts and three years for unwritten contracts. Nonetheless, in the VPPA, the General Assembly, after balancing

196

the interests of all those involved, determined that the decision of a public body would become "final and conclusive" if no appropriate action was taken administratively or judicially within six months.

As the General Assembly has declared in Virginia Code § 2.2-4363(E) that the appropriate window of opportunity for a contractor to be able to appeal an adverse claim decision to a circuit court is six months, a contractual provision that essentially abrogates that right is not legally enforceable. See *Schlosser*, 245 Va. at 455-56, 428 S.E.2d at 921. Notwithstanding the efforts of the Authority to try to cloak the notice of protest provision herein with purported salutary purposes, in actuality, as evidenced by the Authority's position here, it is nothing other than a "gotcha" provision that seeks to make the decision of the Authority final and conclusive within *five days of the date of the final decision*, in direct contravention of the VPPA.[4] The fact that notices of protest may be "commonplace" or supported by public policy considerations does not empower a court to ignore an enactment of the General Assembly. It is generally for the legislature, not the judiciary, to weigh public policy considerations, and here the General Assembly has decided that public policy supports a six month statute of limitations. The Authority may not take away from its nongovernmental contractor what the General Assembly has granted to such contractors by statute. See *Id.*

Furthermore, even if this court found the five-day notice of protest provision was not violative of the VPPA, the enforceability of the notice provision would still have to be evaluated in the context of the Dillon Rule. See *Board of Supervisors v. Countryside Investment Co.*, 258 Va. 497, 503, 522 S.E.2d 610, 613 (1999); *Board of Supervisors v. Home*, 216 Va. 113, 117, 215 S.E.2d 453, 455 (1975). Under the Dillon Rule, local governments have only those powers "expressly granted, those necessarily or fairly implied therefrom, and those that are essential and indispensable." *Countryside*

---

[4] This Court finds totally unpersuasive the public policy rationales advanced by the Authority on brief in support of the notice of protest provision. See Brief in Support of Defendant's Pleas in Bar, pp. 19-20. As MCS was contractually required to complete this $109,000,000.00 contract notwithstanding the Filter Butterfly Valve dispute, this court doubts that receipt of the notice of protest would have been a "welcome relief" to the Authority. Further, as they successfully did on other issues where a dispute arose, the parties did not need a notice of protest provision to give MCS "a second chance" with the Authority. Nor did the Authority need the notice of protest to be placed on notice that a lawsuit might arise out of this dispute so as to provide it with an opportunity to monitor the "extra work" that would be the subject of a damages claim. As the Authority eloquently argued in support of its Third Plea in Bar, the parties knew by May 2003, at the latest, that they had very different views on the Filter Butterfly Valve issue.

*Investment*, 258 Va. at 503, 522 S.E.2d at 613. Under a corollary to the Dillon Rule, the Supreme Court of Virginia has stated that "the powers of boards of supervisors are fixed by statute and are only such as are conferred expressly or by necessary implication." *Commonwealth v. County Board of Arlington*, 217 Va. 558, 573-74, 232 S.E.2d 30, 40 (1977); see also *Gordon v. Board of Supervisors Fairfax County*, 207 Va. 827, 832, 153 S.E.2d 270, 274 (1967); *Johnson v. Goochland County*, 206 Va. 235, 237, 142 S.E.2d 501, 502 (1965); *City of Richmond v. Board of Supervisors County Board*, 199 Va. 679, 684-85, 101 S.E.2d 641, 644-45 (1958). It is necessary, therefore, to determine whether the Authority had the power to include the notice of protest provision in its contract.

Although not cited by either party, the court also believes it appropriate to briefly address certain language in the Supreme Court's opinion in *Board of Supervisors of Prince William County v. Sie-Gray Developers, Inc.*, 230 Va. 24, 334 S.E.2d 542 (1985). In that case, based upon performance agreements between a developer and a county arising out of the proposed development of a subdivision, the developer argued *inter alia* that it could not be liable for failing to construct certain highway improvements because Prince William County was precluded from entering into the contract with the developer for the construction of those improvements because of the Dillon Rule. *Id.* 230 Va. at 30, 334 S.E.2d at 546. The Supreme Court refused to address the merits of that issue, in part, for the following reason:

> To allow appellees to assert a defense of ultra vires would contravene the general principle that "one who makes a contract with a municipality is estopped to assert that it was ultra vires, when it is sought to be enforced against him."

*Id.* (citations omitted). This court declines to extend the stated principle beyond the factual context presented in that case to the facts in the instant case because the developer there attempted to preclude the County from obtaining a basic benefit of its bargain when the developer refused to construct the highway improvements. Further, this case was decided before the Supreme Court's decisions in *W. M. Schlosser* and *Blake Construction* where the Supreme Court ruled contractual provisions were unenforceable and did not even address the possibility of the contractor being estopped from arguing that the relevant contractual provisions were contrary to the VPPA. Moreover, the Authority neither pleaded nor argued that MCS was estopped from presenting

the argument that contracting for a notice of protest requirement was beyond its powers.

The Authority contends that Virginia Code § 2.2-4363(B) grants it power to include the notice of protest provision among its statutorily authorized claims procedures. This court finds the Authority's reliance on Virginia Code § 2.2-4363(B) misplaced in this context. Although § 2.2-4363(B) requires the Authority to include in its contracts a procedure for consideration of such contractual claims, the parties' notice of protest requirement *is not* authorized by that statute. Rather, that provision of the Code requires the Authority to include procedures to consider *contractual claims*, such as those addressed with regard to the Third Plea in Bar. The notice of protest requirement is actually a *post-claim and pre-appeal* condition which is not authorized by statute. Moreover, the statute states that the Authority's decision is final and conclusive unless the contractor appeals within six months of the date of the final decision. See Va. Code § 2.2-4363(E). The notice of protest provision actually works to set up an additional hurdle to the exercise of this statutory right of appeal. This is repugnant to the VPPA and beyond the scope of the Authority's powers under the Dillon Rule.

If this notice of protest provision were determined to be enforceable, one can only imagine the potential scope and breadth of other similar provisions that "innovative" lawyers might insert in other such contracts. To allow selective public bodies to erect such statutorily unauthorized roadblocks to a contractor's right to appeal an adverse claim decision could upset the balance effected by the General Assembly in its enactment of Virginia Code § 2.2-4363, and, for that matter, could be utilized to attempt to undermine other rights granted by the General Assembly to nongovernmental contractors and Virginia's citizens through the enactment of the VPPA. While courts in Virginia will not rewrite contracts between parties, neither will they enforce terms of contracts that "undo what the General Assembly has determined to be the public policy of the Commonwealth." *Blake Const.* at 576, 587 S.E.2d at 718; see also *Blick v. Marks, Stokes and Harrison*, 234 Va. 60, 64, 360 S.E.2d 345, 348 (1987) ("Generally, a contract based on an act forbidden by statute is void and no action will lie to enforce the contract."); *W. M. Schlosser Co.*, 245 Va. at 457, 428 S.E.2d at 922 (holding that a contract could not vitiate a statutory right of a contractor to a hearing before a disinterested person); *W. M. Schlosser Co., Inc. v. Fairfax County Redev. & Hous. Auth.*, 975 F.2d 1075 (4th Cir. 1992) (holding that parties could not validly contractually mandate resort to only administrative appeals when the language of the VPPA also allowed appeals to circuit court.)

The Authority's reliance on the quoted language from *Board of Supervisors v. Sampson*, 235 Va. at 520, 369 S.E.2d 180, on page 21, n. 6, of its initial brief ("Parties to a contract properly may agree that a claim under the contract must be enforced within a shorter time limit than that fixed by statute if the contractual provision is not against public policy and if the agreed time is not unreasonably short.") is misplaced in this context as the timing issue before the Supreme Court in that case arose solely out of the contract between the parties and did not implicate the VPPA. Further, there was no contention made in that case, as there was here, that the contractual time limits set by the parties in their contract were violative of public policy.

Consequently, this court finds the notice of protest provision in the Contract is both legally unenforceable, as violative of the VPPA, and beyond the scope of the Authority's power under the Dillon Rule. Accordingly, the Fourth Plea in Bar is overruled.

### D. *The Fifth Plea in Bar*

In its Fifth and final Plea in Bar, the Authority asserts that MCS waived its right to bring a claim regarding the Filter Butterfly Valve issue when it agreed to the provisions stipulated in Change Order 3. See Exh. 3. CO3 increased the Contract sum due MCS by $133,283.00 for the costs associated with four specific items delineated in that change order, in part in exchange for MCS's acknowledgement that it had no claims against the Authority for the period May 10, 2000, to June 7, 2002, except for twenty-three potential claims for additional compensation that were specifically preserved in the change order. MCS further agreed in CO3 that no additional compensation would:

> be considered for any of the [Authority's] or Engineer's responses to Requests for Clarification submitted by [MCS] . . . or for any actions or comments by Owner or Engineer in the review of Contractor's Shop Drawing Submittals which have not directly resulted in the issuance of a Request for Change Proposal by Owner dated on or before June 7, 2002.

See Exh. 3.

The Authority contends that MCS's claim herein is based upon the response to RFC 312 in September 2001 and, further, that the dispute between the parties concerning the Filter Butterfly Valves arose before June 7, 2002.

Therefore, according to the Authority, MCS is barred from making the claim set out in this lawsuit based upon the contents of CO3.

MCS responds that it does not seek compensation for the Authority's response to RFC 312, as that response did not direct it to install torque tubes; to the contrary, it confirmed MCS's belief that extension stems were required. Further, MCS asserts that this suit is not a claim for the period from May 10, 2000, to June 7, 2002, as it is only seeking compensation for work done after May 8, 2003. Finally, MCS argues that the Filter Butterfly Valve issue was not within the contemplation of the parties when CO3 was executed.

In Virginia, the process of interpreting a release agreement is no different from the analysis undertaken in construing any other contract. *Berczek v. Erie Ins. Group*, 259 Va. 795, 799, 529 S.E.2d 89, 91 (2000). The meaning of the agreement is governed by the intent of the contracting parties. *Richfood, Inc. v. Jennings*, 255 Va. 588, 591, 499 S.E.2d 272, 275 (1998). When the language of the contract is clear and unambiguous, the words of the agreement itself govern the rights and responsibilities of the parties. *Id*. Hence, this court must initially determine whether the relevant provisions of CO3 are clear or ambiguous.

In relevant part, CO3 states as follows:

> In accordance with General Conditions Article 3, Paragraphs C.1 and E.1, the contractor acknowledges that he has notified the Authority, in writing, regarding all issues for which the Contractor believes he is entitled to additional compensation and/or an extension of time may be due. The Contractor hereby agrees there are not now, nor will there be any *claims* for any reasons, *for the period between Notice to Proceed and June 7, 2002. . . .*
>
> No additional compensation or extension of the Contract Period will be considered for any of the Owner's or Engineer's *responses to Requests for Clarifications submitted by Contractor*, for any work changes issued by Owner in Record of Minor Changes, or *for any actions or comments by Owner or Engineer in the review of Contractor's Shop Drawing Submittals* which have not directly resulted in the issuance of a Request for Change Proposal by Owner dated on or before June 7, 2002.

(Exh. 3, pp. 2, 3 (emphasis added).) The parties present differing interpretations of both provisions. As to the former, the Authority contends that, prior to June 7, 2002, a dispute had arisen between the parties concerning the Filter Butterfly Valves and, as MCS had not notified it in writing that it claimed additional compensation was due for the necessary remedial work and the installation of torque tubes, such *claim* was waived. MCS responds that it makes no claim for any work done prior to June 7, 2002, and, therefore, it has not released its claim in this case. As to the latter provision, the Authority argues that MCS's claim herein is premised on an allegation that the Authority and its Engineer misread the relevant Shop Drawing Submittals and responded in error to RFC 312. MCS replies that its claim in this case arose out of the Authority's after-the-fact mandatory directive to install torque tubes in the Filter Butterfly Valves when the Contract between the parties called for extension stems to be supplied.

Although an ambiguity in a contract does not exist simply because the parties present differing interpretations of its meaning, see *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984), the interpretations of both provisions posited by the parties are not unreasonable. Under Virginia law, "an ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time." *Golding v. Floyd*, 261 Va. 190, 193, 539 S.E.2d 735, 737 (2001) (quoting *Amos v. Coffey*, 228 Va. 88, 91-92, 320 S.E.2d 335, 337 (1984) (quoting *Renner Plumbing v. Renner*, 225 Va. 508, 515, 303 S.E.2d 894, 898 (1983)). As a result, this court finds that CO3 is ambiguous and the court must therefore discern the intent of the parties not only from the words of the Contract but also from the relevant parol evidence. *Aetna Casualty v. Fireguard Corp.*, 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995).

What is perhaps most telling about whether the parties intended CO3 to effect a release of MCS's claims for work done on the Filter Butterfly Valves is the utter lack of credible evidence presented by the Authority at the pleas in bar hearing that anyone intended this issue to be covered by CO3. Indeed, it is difficult to believe that MCS would have waived a claim for sums in excess of $500,000.00 in order to receive $133,283.00 for additional costs arising from the four other separate items set out in CO3. After full consideration of this issue, this court finds MCS's interpretation of the language utilized in the two disputed parts of CO3 to be more reasonable. Additionally, when the court considers the parol evidence of the parties' intent presented and not presented at the plea in bar hearing, the court finds that the parties never intended CO3 to cover matters related to the issue concerning the Butterfly Filter Valves.

Consequently, the Authority has failed to satisfy its burden of proof on this plea in bar. The court rejects MCS's estoppel theory, however, both because there was no credible evidence of a change of position by MCS in reliance on the Authority's claimed action and for the reasons articulated by the Authority on page 10 of its Reply Brief. See *Weichart Co. v. First Commercial Bank*, 246 Va. at 109, 431 S.E.2d at 309. Accordingly the Fifth Plea in Bar is overruled.

## III. *Conclusion*

For each of the reasons set out above, the court finds that MCS is barred from bringing its claim for additional compensation arising from the "extra work" it was required to perform in the Filter Building because MCS (1) breached the Contract by failing to properly notify the Authority about any alleged error or conflict in the Contract Documents and Drawings prior to proceeding with the work; and (2) failed to give timely notice of the claim as required by the Contract and the Virginia Public Procurement Act. Additionally, for the reasons set out above, the court finds that (1) the Authority has abandoned its Second Plea in Bar by not presenting any evidence or argument to support it; (2) the contractual notice of protest provision is unenforceable as contrary to law; and (3) the parties did not intend that Change Order 3 would cover the claims herein. Therefore, the First and Third Pleas in Bar are sustained and the Second, Fourth, and Fifth Pleas in Bar are overruled. Accordingly, this case is dismissed with prejudice. The exceptions of the parties to all adverse rulings are noted for each of the reasons ably articulated by counsel at the hearing and on brief.