# CIRCUIT COURT OF FAIRFAX COUNTY

Modern Continental South

v.

Fairfax County
Water Authority

November 21, 2006

Case No. (Law) 225019

BY JUDGE STANLEY P. KLEIN

This matter remains before the court on Plaintiff's Motion for Reconsideration of this court's orders of February 9, 2006, and February 13, 2006, sustaining Defendant's First and Third Pleas in Bar and dismissing this matter with prejudice.

The underlying dispute arises out of a March 23, 2000, contract between the Fairfax County Water Authority (the Authority) and Modern Continental South (MCS) for the construction of a $109,000,000.00 water treatment plant, known as the Frederick P. Griffith, Jr., Water Treatment Plant (the Project). The controversy centers on the requirements for the construction of certain valves in the Filter Building. The parties disagree as to whether the mechanisms operating the valves were to be extension stems, as claimed by MCS, or torque tubes, as claimed by the Authority.

In its letter opinion of February 9, 2006 [70 Va. Cir. 172], this court has already addressed almost all of the issues raised by MCS in its Motion for Reconsideration, including all of the arguments relating to the court's ruling on the Authority's Third Plea in Bar. The Court remains convinced that both Virginia law and the Contract between the parties supports its ruling on the

Third Plea in Bar, and, therefore, the portion of the Motion for Reconsideration challenging the court's ruling on the Third Plea in Bar is denied for the reasons set out in the court's February 9, 2006, opinion letter. However, MCS did raise one issue concerning the Authority's First Plea in Bar which merits further discussion, as it was not addressed in the court's original opinion letter. The court notes that MCS's argument concerning the "*Spearin* Doctrine" was addressed solely in one footnote in MCS's original briefing of the issues raised in the Authority's Pleas in Bar. See Plaintiff's Brief in Opposition to Defendant's Pleas in Bar, at 6, n. 9.

In its Motion for Reconsideration, MCS argues that this court erred by interpreting the Contract between the parties as imposing an "unlimited obligation" upon MCS to identify and point out any and all errors or conflicts in the Contract Documents. MCS asserts that this court must interpret the Contract in light of the so called *Spearin* Doctrine of contract interpretation which dictates against "shifting unlimited risk for owner-caused conflicts to the contractor." Plaintiff's Memorandum in Support of Motion for Reconsideration p. 5, referencing *United States v. Spearin*, 248 U.S. 132, 39 S. Ct. 59, 63 L. Ed. 166, 54 Ct. Cl. 187 (1918). MCS contends that it was only required to report patent or obvious errors or conflicts that it knew or should have known existed in the Contract Documents and that it did not assume unlimited responsibility for owner-originated design flaws. Thus, this court is asked to re-evaluate the duty imposed upon MCS by not only the express language of the Contract but also an analysis of the *Spearin* Doctrine.

In *United States v. Spearin*, the United States Supreme Court addressed a federal contract containing language requiring Spearin, the contractor, to assume responsibility for verification of plans and specifications for the construction of a dry-dock at the Brooklyn Navy Yard. *United States v. Spearin*, 248 U.S. 132, 133, 39 S. Ct. 59, 60, 63 L. Ed. 166, 54 Ct. Cl. 187 (1918). The contract, in part, required the contractor to divert and relocate a section of a sewer piping and the plans included specific provisions directing the dimensions, material, and location of the section of the sewer pipe to be relocated. Prior to entering into the dry-dock contract, neither the Government nor Spearin was aware that there was a dam in a connecting piece of sewer pipe which would divert large quantities of water to the replacement pipe during periods of heavy water flow. *Id.* at 134, 39 S. Ct. at 60. The Government was aware, however, that the sewers in the area of the dry-dock had overflowed from time to time in the years prior to the start of the dry-dock construction, but this information was not communicated to Spearin. Spearin complied with the plan requirements for relocation of the sewer pipe, and the Government accepted the work as satisfactory. *Id.*

Approximately one year after the sewer pipe relocation, during a period of heavy rain coincident with high tide, excess internal pressure caused the new pipe to break and flood the excavation area for the dry-dock. Spearin promptly informed the Government that he considered the sewers under the construction area to be "a menace to the work" and that he would not continue construction until the Government either "made good or assumed responsibility" for the damage which had already occurred. *Id.* at 135, 39 S. Ct. at 60. He also informed the Government that he would not continue construction until the Government either made appropriate changes to the sewer system in the area or assumed responsibility for "damage which might thereafter be occasioned." *Id.* In response, the Government insisted that Spearin bore the responsibility for addressing the existing conditions and, after many months of unproductive discussions, the Government annulled the contract and sought a new contractor to complete the project. *Id.* at 135, 39 S. Ct. at 61. As a result, Spearin filed suit, and at trial was awarded not only the sum due for the work already completed but also the profit he would have earned had he completed the project. *Id.*

On appeal, the Supreme Court observed that principles of federal contract law dictated that the Government could not pass on to Spearin the responsibility for the failure of the relocated pipe. The Court reasoned as follows:

> Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. ... But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. ... This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work. . . .

*Id.* at 136, 39 S. Ct. at 61 (citations omitted).

> The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry-dock had not contained the provision for relocation of the six-foot sewer. But the insertion of the articles prescribing the character, dimensions, and location of the sewer imported a warranty that,

if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check the plans, and to assume responsibility for the work until completion and acceptance. ... The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view.

*Id.* at 137. 39 S. Ct. at 61 (citations omitted); *see also Secretary of the Army v. Edsall Construction Co.*, 296 F.3d 1081, 1084-85 (Fed. Cir. 2002) (holding that, when the Government provides a contractor with binding design specifications, the Government has impliedly warranted that the specifications are free from design defects and "general disclaimers requiring the contractor to check plans and determine project requirements do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications.")

Thus, under federal common law, a contractor who is contractually bound to build according to plans and specifications proposed by the owner will not be responsible for consequences arising from defects in such plans and specifications.

On brief, MCS correctly notes that the Supreme Court's decision in *Spearin* was approvingly cited by the Supreme Court of Virginia in *Southgate v. Sanford and Brooks Co.*, 147 Va 554, 563-64, 137 S.E. 485, 487 (1927). Additionally, MCS argues that the Supreme Court of Virginia's decision in *Worley Bros. Co. v. Marus Marble and Tile Co.*, 209 Va. 136, 161 S.E.2d 796 (1968). should lead this court to conclude that "Virginia courts follow the `*Spearin* Doctrine'." Plaintiff's Brief in Opposition to Defendant's Pleas in Bar, at 6, n. 9. However, as the *Worley* Court noted, the limits of any such doctrine under Virginia law were established by our Supreme Court in *Richmond, Inc. v. Ewing's Sons*, 200 Va. 593, 595, 106 S.E.2d 595, 597 (1959), where the Court opined as follows:

Generally, a construction contractor who has followed plans and specifications furnished by the owner which have proved defective or insufficient will not be responsible to the owner for loss or damage which results solely from the defective or insufficient plans and specifications in the absence of negligence on the contractor's part, *or any express guarantee or warranty by him as to their being sufficient or free from defects.*

*Worley* at 142 (emphasis in original) (citations omitted).

Here, contrary to the circumstances present in both *Spearin* and *Worley*, MCS was not contractually required to construct based solely upon plans dictated by the Authority. To the contrary, pursuant to the Contract, MCS was required to "verify all ... details shown on the drawings ... received from the Engineer" and to "notify him of all errors, omissions, conflicts, and discrepancies." Exh. 1, Gen. Req't, Art. 1.9(A), at 1110-5 to 1110-6. Indeed, the Contract makes clear that "[t]he Contractor shall assume all responsibility for the making of estimates of the ... quality of materials and equipment included in work to be done under the contract." *Id.* Hence, here, contrary to the situations in both *Spearin* and *Worley*, MCS at least implicitly warranted to the Authority that the drawings that MCS was contractually obligated to review for defects or ambiguities, were, in fact free from any such infirmities.

Further, contrary to the circumstances in both *Spearin* and *Worley*, where the parties did not contemplate the ultimate unforeseen difficulties when they entered into their contracts, here, the remedial work that MCS was forced to undertake arose precisely from errors and ambiguities in the Contract Documents that the parties had envisioned could potentially lead to the type of difficulties in fact experienced with the butterfly valves. Knowing that such conflicts in the documents could lead to such foreseeable consequences, MCS and the Authority squarely placed the entire responsibility on MCS to determine whether any such problems in the Contract Documents existed and to see that these problems were rectified prior to the commencement of the butterfly valve work. At different times, MCS has conceded both that Contract Document DM-24 included an "error"[1] and that torque tubes were required for all the 42 "Filter Backwash Drain Valves"[2] in the Filter Building. Therefore, MCS's argument that (1) the factual situation here is akin to the factual situation in *Spearin* and (2) that it should not have been expected to discover the discrepancies in the contract documents by exercising reasonable diligence are both unconvincing.

This court therefore finds that the decisions in *Spearin* and *Worley* are inapposite and provide no legal basis upon which to reconsider the ruling on the First Plea in Bar. Accordingly, Plaintiff's Motion for Reconsideration is

---

[1] See June 6, 2005, transcript of dep. of Don Breda, MCS's corporate designee.

[2] See February 9, 2006, Letter Opinion, at 8 [70 Va. Cir. at 181].

denied in its entirety. Counsel have advised the court that the cost of torque tubes versus the cost of extension stems issue has been rendered moot. This matter, therefore, stands dismissed with prejudice.

## Final Order of Dismissal

Whereas, by decision dated February 9, 2006, this Court sustained two pleas in bar filed by Defendant Fairfax County Water Authority ("Defendant" or "FCWA") and subsequently dismissed this action by order dated February 13, 2006; whereas, in responses to the Motion to Suspend the Final Order, for Reconsideration of the February 9, 2006, Decision, and for Leave to File a Memorandum in Support in Excess of Twenty Pages filed by Plaintiff Modern Continental South, Inc. ("Plaintiff" or "Modern"), this Court subsequently entered an order suspending its previous February 13, 2006, Order; whereas, Plaintiff Modern and Defendant FCWA have resolved the disputes in the above-captioned action; and upon consideration whereof, it appearing to the Court that the claims set forth in the Motion for Judgment filed herein by Plaintiff Modern against Defendant FCWA, and as amended, have been settled, compromised, and agreed and that said Motion for Judgment should be dismissed with prejudice, it is, therefore, ordered, adjudged, and decreed that the suspending order heretofore entered by this Court be and it is hereby vacated and the Motion for Judgment heretofore filed by Plaintiff Modern against Defendant FCWA be and it is hereby dismissed with prejudice.