# CIRCUIT COURT OF AUGUSTA COUNTY

Fielder's Choice
Enterprise, Inc.

v.

Augusta County

March 25, 2015

Case No. CL14001702-00

By Judge Victor V. Ludwig

On or about July 12, 2012, Fielder's Choice Enterprises, Inc. (FCE), and Augusta County entered into a written contract to complete a project known as the "Greenville Village Sanitary Sewer Project." Compl. ¶ 3. The Contract consists of several complex documents (some appearing to be standard or, in some instances, jerry-rigged, forms), including initial bids, addenda, and detailed specification drawings, Compl. ¶¶ 6–9, to some of which I will refer. Pursuant to the Contract, FCE agreed, *inter alia,* to install sanitary sewer carrier pipe under and across Route 11 at a location near South River (the Route 11 Crossing). FCE filed a complaint alleging that the County breached the Contract and asked for damages or "equitable adjustment," interest, attorney's fees, and costs. In response, the County filed a motion craving oyer, a motion to strike (collectively, the MCO), and a demurrer. The Court heard the parties argue this matter on January 20, 2015, and, after carefully considering the parties' arguments and supporting memoranda, I am now prepared to rule.

## I. *Facts*

The facts are drawn from the Fielder's Choice complaint, which the Court must accept as true at this stage in the case, subject to the principle of law that it does not accept facts alleged which are otherwise contradicted in the pleadings.

The Contract included a document entitled "Contract Documents & Technical Specifications Greenville Village Sanitary Sewer Project," dated May 12, 2012 (the Contract Documents). Compl. ¶ 5. FCE alleged that Page C09 of what FCE identified (but did not define) as "the Construction

Drawings" required that the installation of the line at the Route 11 Crossing be by "direct drilling" (the DD method), a specific technique of installing the line. Compl. ¶ 7.

In fact, Compl. ¶ 7 misstates that the drawing referred to the DD method, but that error was clarified at the hearing, and that misstatement causes confusion throughout the Complaint and other pleadings. All parties agreed that the DD method simply was never a part of the drawing, although it did refer to "Jack & Bore" (the J&B method). Both the J&B method and the DD method consist of pushing or routing pipes under a roadway or structure. Each method's primary benefit is that it prevents or limits "the disturbance of existing surface areas such as roadways and streams." (Compl. ¶ 15.)

Addendum 1 to the Contract, issued on June 5, 2012, provided that, "[a]lthough plans depict HDPE direct drill, all VDOT [Virginia Department of Transportation] road crossings, with the exception of Rt. 11 crossings, may be installed by open cut." Compl. ¶ 8. "Open Cut" (the OC method) is yet a third method of installing the pipe. With the OC method, an area of the ground is trenched, the piping is placed in the trench, and the trench is resurfaced. This method disrupts surface streets and other crossings during construction, requiring the submission and implementation of a traffic maintenance plan. (Compl. ¶ 12.) As of the date of the issuance of Addendum 1, the County had not obtained permission from VDOT to use the open cut method at the Route 11 Crossing. Compl. ¶ 9.

Although FCE attempted to perform the work at the Route 11 Crossing using the DD method, it was unable to do so because of subsurface conditions which differed materially from what it expected to encounter based on information from the County, and, as a result of those conditions, "FCE was unable to install the requisite steel casing at the Route 11 Crossing using either the [DD method] or the [J&B method]." Compl. ¶ 17. FCE then notified the County that further efforts to use the DD method would be inappropriate and dangerous due to the different site conditions. Compl. ¶¶ 18-20. Nevertheless, the County directed FCE to perform the work as prescribed by the Contract, FCE attempted to do so, and the use of the DD method resulted in a collapse of a portion of Route 11. Compl. ¶¶ 22-23.

The unexpected subsurface conditions required a change in the scope of FCE's work by requiring that it use the OC method, which is more time consuming and more expensive, resulting in additional costs to FCE. Compl. ¶ 24.

On October 31, 2013, the Project Engineer removed Drawing C09 and substituted another drawing, which removed the direction that the work at the Route 11 Crossing be completed using the "jack & bore" method. Compl. ¶ 25 and Exhibit E. Exhibit E also contains the following cryptic notation: "Removal of ReF to DD or [illegible, but what appears to be "or Bre only"] 24" casing [illegible]." It also shows: "Recd FCE 11/16/13." The notation is curious because the version of C09 which the substitute

68

replaced did not "ReF to DD." Recall that the original C09 referred to the J&B method. *See* below. As a result of FCE's inability to perform the work as originally described on Drawing C09, "VDOT permission was required to be obtained and FCE was required to expend additional time and work to obtain" such permission. Compl. ¶ 26. After someone obtained permission from VDOT to install the pipe by the OC method (and the inference from Compl. ¶ 26 is that it was FCE which did that),[1] FCE installed the pipe using that method. Compl. ¶ 27. FCE timely notified the County that it would claim additional compensation for the additional work, and, although it did so, the County denied the claim. Compl. ¶¶ 27, 29, and 31.

Even to consider the issues before the Court at this stage of the proceeding, it is helpful briefly to describe a few important documents incorporated (or not) into the Contract before addressing the MCO and the Demurrer.

1. On May 12, 2012, a civil engineering firm created Drawing C09 (Compl. Ex. B), which indicates that FCE should employ the J&B method for the Route 11 Crossing.

2. Addendum 1, dated June 5, 2012, provided a "clarification," stating. "[a]lthough plans depict HDPE direct drill, all VDOT road crossings, with the exception of Rt. 11 crossings, may be installed by open cut." Compl. Ex. C. (The first dependent clause and its reference to "direct drill" (or, more to the purpose, its lack of reference to the J&B method) may be a subject of contention in interpreting the sentence as it applies to the Route 11 Crossing because the plans (presumably Drawing CO9, prior to its amendment in October 2012, after the Contract had been executed) specified only the J&B method at that point (without reference to the DD method). *See* Dem., IV, ¶¶ 6-9.)

3. An unsigned bid form from May 12, 2012 (the May Bid Form) included the indication "J&B/DD" next to the notation regarding the steel casing that would be used for the Route 11 Crossing. (Compl. Ex. D.)

4. Addendum 1 also referred to a "Revised Bid Form" on "colored paper" which was attached to the Addendum, and the Addendum provided that the "Colored Bid Form must be used for submitted Bid, and Bid must acknowledge Addendum No. 1." Compl. Ex. C.

5. The County, as part of its MCO, represents that the "Bid Form issued on June 5, 2012, is Bid Form 00410 (06/12)" (the June Bid Form) and that FCE "signed and submitted" it. Defendant's Memorandum in Support of MCO, III, D. The June Bid Form contains no reference to the "J&B/DD"

[1] Counsel for FCE stated during oral arguments that, generally, "bidders are not, essentially, proper parties to go ask VDOT and expend money to obtain permission from VDOT to do open cut work." Tr., at 31. He later said (not without ambiguity) that "ultimately, the County got the permission, using — through the general contractor . . . [FCE] is just a general contractor." Tr., at 34. Counsel for the County stated that FCE "did seek and obtain permission" to use the OC method. Tr., at 20.

indication that appeared on the May Bid Form. For the Court's consideration of the MOC, it is important to note that Addendum 1, included in the Complaint as Exhibit C, references the June Bid Form at paragraph 1 of the second page under the heading "changes to contract documents." (That is not entirely accurate, but, for the reasons described below, the Court accepts it as true.)

6. Section 01270 ¶ 3.1.A.6 in the List of Unit Prices (a part of the Contract) contained a list of unit prices (the Unit Prices). That subsection provided:

> Steel Casing Pipe: Casing pipe will be measured and paid for per linear foot for size and type installed. The unit price will include casing pipe installation, jacking, boring, sealing drain, spacers and other associated Work items, all according to detail drawing.[1] Casing pipe shall be jack & bore, direct drill, or tunnel liner plate, and shall be guaranteed except when VDOT gives specific permission to open cut a roadway, in which case the bid price for the casing pipe swill be used for open cut.

Compl. ¶ 16. The County, in its MCO, submits that FCE has quoted only a small portion of one subsection of the Section. It asks the Court to require inclusion of the entire § 01270 as it appears as Ex. P of the Demurrer, which includes additional language addressing what is included in the Unit Price.

One basis for the County's Demurrer is that FCE alleges that Drawing C09 required it to effect the Route 11 Crossing using the J&B method but, to the extent that is true, FCE failed to fulfill its obligations under the Contract by installing the line at the Route 11 Crossing by that method. Alternatively, if the Court strikes the Complaint's reference to the May Bid Form, FCE may not rely on it to allege that it was limited to the J&B or DD methods to effect the Route 11 Crossing. A third alternative basis for the Demurrer is that, to the extent that the Unit Price provision quoted in ¶ 16 of the Complaint is more than administrative, it authorizes any of four methods of installation at the Route 11 Crossing. Thus, a critical issue here, for both the motions and the demurrer, is determining which method or methods of installation the Contract required (or which it authorized) for the Route 11 Crossing.

---

[1] Assuming the accuracy of the County's Ex. P., there should have been an ellipsis here because there are two missing sentences. That missing data may be a matter of no substantive consequence, but the quote should be right.

## II. *Analysis*

### A. *Motion Craving Oyer*

FCE included the May Bid Form in the Complaint but excluded the June Bid Form. The County craves oyer to add the June Bid Form to the Complaint and moves to strike the May Bid Form. The County seeks to add both a signed and unsigned version of the June Bid Form. In addition, the County seeks to add the entire 01270 (Unit Prices) that FCE partially quotes in ¶ 16 of the Complaint.

A motion to crave oyer seeks to include documents mentioned in but not attached to a complaint. *Colinsky Consulting, Inc. v. Holloway*, 57 Va. Cir. 403, 405 (2002) (citing *Sjolinder v. American Enters. Solutions, Inc.*, 51 Va. Cir. 436, 436 (2000)). A court should only grant a motion to crave oyer if the documents sought are essential to the plaintiff's complaint. *Station # 2, L.L.C. v. Lynch*, 75 Va. Cir. 179, 197 (2008). In other words, the documents must be necessary to a court's objective and intelligent construction of the complaint. *Culpeper Nat'l Bank v. Morris*, 168 Va. 379, 382–83 (1937); *Resk v. Roanoke County*, 73 Va. Cir. 272, 273–74 (2007). These motions ensure that plaintiffs do not put "blinkers on the court" by only providing favorable documents in the complaint. *Culpeper Nat'l Bank*, 168 Va. at 382. After granting a motion to crave oyer, a court must consider the newly incorporated documents when determining the validity of a complaint. *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997).

The County contends that, under Addendum 1, the June Bid Form superseded the May Bid Form. As such, the May Bid Form is no longer part of the Contract. In essence, the County maintains that FCE relies on an old document that could not form the basis of its breach of contract claim. The County contends that the Court can only judge the validity of the Complaint if the June Bid Form is incorporated. In addition, the County claims that FCE only quotes a portion of the Unit Prices as it relates to steel casing pipe used for the Route 11 Crossing. The full text indicates that the Unit Prices will include compensation for, *inter alia,* "unsuccessful bore attempts and incidentals as required by VDOT as necessary to complete the Work." (Dem. ¶ 8.)

FCE responds that the Contract contains hundreds of pages and that it is not required to include every page. Instead, it argues, it must only include those documents that are essential to its claim. FCE then states conclusively that, although the June Bid Form and the full list of Unit Prices may be part of the Contract, neither is essential to its claim.

Addendum 1, which is included in the Complaint as FCE's Exhibit C, makes reference to the June Bid Form, and it states clearly that the June Bid Form supersedes the May Bid Form. Complaint, at Ex. C, p. 2, ¶ 1. As a result, the Court cannot adequately assess the Complaint or the Demurrer

based on a form which is no longer part of the Contract, ignoring the revised form which is. This is especially important because the June Bid Form makes a significant change to the May Bid Form, it contains no direction regarding how the line at the Route 11 Crossing could be installed.

The full list of Unit Prices, however, is not essential to the Complaint. The portion which is included in ¶ 16 of the Complaint deals directly with the method of installation, whereas the portion the County wishes to add deals with *compensation* based on the method of installation actually used. Such a provision is not necessary to determine the validity of the Complaint; because we accept as true all facts the FCE has properly alleged in the Complaint, it is sufficient that it claims it is owed compensation. It may be true, as the County appears to argue, that FCE is entitled to no additional compensation under these facts, but such an analysis goes to the truth of the allegations and the interpretation of the Contract, not to the question of whether the Complaint states a cause of action.

The County also moves to strike from the Complaint Exhibit B and ¶¶ 14 and 15. Exhibit B is the May Bid Form, and ¶¶ 14 and 15 reference certain information contained in the May Bid Form. Paragraph 5 of the Complaint defines the "Contract Documents," and the implication of ¶¶ 14 and 15 of the Complaint is that "Section 5.01 of the Bid Form (page 410-3) [is] found in the Contract Documents." However, Addendum 1, on page 2, ¶ 1, refers to a "Revised Bid Form Section 00410," which the Addendum states is attached to it. Sadly for the Court, it is not attached to the copy of the Addendum which appears as the Complaint's Exhibit C. Without that attachment and without more, the Court cannot know whether the May Bid Form was a revised bid form or, more precisely, whether it is the bid form to which the Addendum refers. Moreover, assuming that the May Bid Form was superseded, without more, the Court cannot know whether the June Bid Form (submitted by the County) is the bid form that was attached to the Addendum.

However, there is more. During the arguments presented on January 20, 2015, counsel for FCE, referring to the May Bid Form, first argued that it was one of "two forms [that] we believe showed how to perform the work at this location," but then acknowledged that "[i]t was later rescinded." Tr. at 41. We know, then, that the factual allegation that the May Bid Form is part of the Contract is incorrect because (a) FCE has acknowledged that it was rescinded prior to the parties' entering into the Contract and (b) Addendum 1 refers to a revised bid form which is part of the Contract.

As I will discuss below, although the Contract may be ambiguous in some particulars, in one particular it is not: the May Bid Form was not part of it. Whether the May Bid Form is admissible for the purpose of ascertaining the meaning of the Contract is not so clear. If, at trial, "this case presents a situation in which 'neither party [offers] a construction of these provisions that could be deemed so clear that it unambiguously

excludes the explanation offered by the opponent,' *Cascades North Venture,* 249 Va. at 582," that "alone is sufficient to justify the admission of parol evidence concerning the parties' intent and understanding at the time they entered into the contract." *Westmorland-L.G.&E. Partners v. Virginia Elec. & Power Co.*, 254 Va. 1, 12 (1997). However, the concepts and theories of admissibility are distinctly different; one cannot maintain that a document is part of a contract (which the May Bid Form manifestly is not) and, at the same time, argue that the same document is not a part of the contract but is evidence of a prior or contemporaneous negotiation that explains an ambiguous contract (which the May Bid Form might do).

Hence, the assertion that the May Bid Form is a part of the Contract is simply wrong, and the Court need not "accept . . . factual allegations as true [when] they are refuted by the terms of the authentic, unambiguous documents that are a part of the proceeding." *Ward's Equip. v. New Holland N. Am.*, 254 Va. 379, 384 (1997). Because FCE is proceeding on a breach of contract theory (not, *e.g.*, a theory of fraud in the inducement), the May Bid Form cannot be a basis for its claim (although it may have other uses).

Having made those observations, however, the Court is not aware of any case that supports a motion to strike a specific allegation simply because it does not appear to be true. It certainly is not a matter of common course, and neither party has cited to me a single case in which any court in the Commonwealth has singled out and stricken an allegation, even if it does not appear to stand close scrutiny.

That statement is true but incomplete. In *Hanners v. Pender Mill I Associates,* 21 Va. Cir. 177 (1990), 1990 Va. Cir. LEXIS 289, the Court purported to address a "motion to strike the allegations seeking indemnification contained in the cross-claim." *Id.* However, Judge Annunziata concluded the opinion thus: "For these reasons [the defendant's] demurrer is sustained." It appears that Judge Annunziata either found a demurrer hiding in the clothing of a motion to strike or conflated the pleadings. That, however, is as close as any case in the Commonwealth comes to sustaining a motion to strike a specific allegation. Even at that, it was not a discrete allegation of fact that was struck, but a claim, and that is a proper target for a demurrer.

The principle cited in *Ward's Equip.* is not one that is generally (or, so far as I am aware, has ever been) used in this context or for this purpose; rather, it is (and in that case, was) applied to rule on a demurrer.

With respect to the June Bid Form, the County craves oyer as to a signed and an unsigned version, asserting that its Exhibit O is the bid form that was attached to Addendum 1 and that Exhibit N is the same bid form in its unexecuted state. During the hearing (and referring to the June Bid Form), counsel for FCE acknowledged that "[i]t is a contract document. We are not denying it is a contract document." Tr. at 41. It is a reasonable inference that FCE has acknowledged that the signed June Bid Form is the bid form that was attached to Addendum 1.

Without that concession, the County would be asking the Court to infer that the June Bid Form that it has submitted is the bid form referenced in Addendum 1 and to include it as part of the Complaint, but the language in Addendum 1 does not so specifically identify the June Bid Form. The Addendum refers only to "Revised Bid Form Section 00410" and describes it as being "printed on colored paper." If the County wants the Court to address the bid form described in the Addendum, it should ask in a way that does not require the Court to make unsubstantiated assumptions that the document that it presents is the document to which the Addendum refers; that crosses the line from demanding that FCE produce documents to be appended to the Complaint to asserting facts in its own pleadings. To be sure, there are indicia that the June Bid Form presented by the County is the one to which Addendum 1 refers. The June Bid Form carries the same date as Addendum I, but that is hardly dispositive; the County's Exhibit P (the Unit Prices) bears a date of "03/12." The County asserts that FCE accepted the June Bid Form, but nothing in any document attached to the Complaint confirms that. Although there is a cryptic set of initials next in 3.01.A. on the County's Exhibit P, the Court would have to accept as true that those are the initials of an authorized representative of FCE, and, although there is a basis for the Court to believe that they are the initials of Donald Cantore, President of FCE, that is an inference which the Court would have to accept as true. The County is not in the position to make allegations at this stage of the proceedings. All of this might have been easier if the County had simply craved oyer of the bid form to which Addendum 1 referred.

The Court denies the motion to strike FCE's Exhibit B and ¶¶ 14 and 15 and grants the County's motion craving oyer as to the signed June Bid Form but not as to the unsigned June Bid Form (for the same reasons that the Court has stricken the May Bid Form). I note that my observations regarding the unsigned May Bid Form are also relevant to the unsigned June Bid Form. The difference, however, in not striking one and not requiring the other to be appended to the Complaint is that (a) I have no basis to strike the May Bid Form, and (b) the County has not explained how the unsigned June Bid Form (not part of the Contract either) is critical to FEC's claim or how not having it appended puts blinders on the Court. In addition, the Court denies the motion craving oyer as to the Unit Prices.

Based on these assumptions, I consider Exhibit O as part of the Complaint when analyzing the demurrer below.

B. *Demurrer*

The County demurs on two points, neither of which is persuasive.

The first basis for the Demurrer addresses alternative theories of what installation methods were available to FCE at the Route 11 Crossing. As I noted above, the County contends that, to the extent the Contract required FCE to install the line at the Route 11 Crossing by the J&B method (as

FCE alleges), FCE alleges that it attempted only the DD method, so it never performed its obligations under the Contract and cannot be heard to complain about it. Second, to the extent that FCE cannot argue that it was limited as to its selection of the method by either the May Bid Form or ¶ 3.1.A.6 of Unit Prices, FCE cannot recover, because any of the methods were acceptable and FCE merely performed its contractual obligations.

Second, in its memorandum (but not in the Demurrers), the County contends that FCE implicitly warranted that the information the County provided on the subsurface conditions was correct and sufficient; thus, FCE cannot allege that the road at the Route 11 Crossing collapsed due to subsurface conditions that prevented using both the J&B method and the DD method.

From the demurrant's perspective, "only grounds stated in the demurrer may serve as a basis for sustaining the demurrer." *Anthony v. Verizon Va., Inc.*, 2014 Va. LEXIS 99, **13 (2014). Thus, it is likely improper for the Court to consider this point. But, even if this had been included in the Demurrer, the County is still wrong, so I will analyze this issue for purposes of disposing of it, should the propriety of raising the question at this point in the process become an issue for appeal.

*1. As to the First Two Issues, Did the Contract Require FCE To Use Only the J&B Method To Install the Line at the Route 11 Crossing or Did the Contract Permit FCE To Use Any of the J&B, DD, or OC Methods?*

I have noted the County's assertions regarding the methods required or available for use by FCE. Alternatively, the County seeks to hoist FCE on its own petard by conceding that it was required to use only the J&B method (but failed to do so)[1] or maintains that FCE could use any of three methods, including the OC method (hence FCE cannot complain about having to use any of them). As I previously noted, a critical issue is determining which method or methods of installation the Contract required (or which it authorized) for the Route 11 Crossing.

a. Drawing C09 (as it was at the time the parties contracted) indicates that FCE would employ J&B method at the Route 11 Crossing.

b. Addendum 1, on page 1, at ¶ 13, provides: "Although plans depict HDPE direct drill, all VDOT road crossings, with the exception of Route 11 crossings, may be by open cut." The County accurately notes that this provision refers only to the DD method (and there are three crossings shown on C09 which contemplate the use of HDPE pipe). Moreover, at the Route 11 Crossing, there is a reference only to the J&B method and to DIP pipe. The County maintains, then, that the provision is of no help to

---

[1] I note that FCE has alleged that, whether or not it attempted to use the J&B method, it could not use either that method or the DD method because of subsurface conditions which were materially different from those "which [it] expected to encounter based on information provided by the County. . . ." Compl. ¶ 17.

FCE. The sentence is troublesome in that it appears to create a category of VDOT crossings, specifically all VDOT crossings which contemplate the use of HDPE pipe and the DD method. As to that category, the sentence provides that the installations may be accomplished by use of OC method as well. The problem with the sentence is that it specifically excepts from that category the Route 11 Crossing, without recognizing that it was never in it.

 c. Section 1270, paragraph 3.1.A.6, of the Unit Prices provides:

> Casing Pipe will be measured and paid for per linear foot for size and type installed. The unit price will include casing pipe installation, jacking, boring, sealing drain, spacers, and other associated Work items. Casing pipe shall be jack & bore, direct drill, or tunnel liner plate, and shall be guaranteed except when VDOT gives specific permission to cut a roadway, in which case the bid price for the casing pipe will be used to pay for open cut.

Compl. ¶ 16. This provision apparently approves the use of the J&B method or the DD method where casing pipe is to be used (as it is at the Route 11 Crossing), as well as the OC method if approved by VDOT.

 On oral argument, counsel for the County acknowledged that FCE could have used any of four methods (the OC method subject to the approval of VDOT), Tr., *e.g.*, at 14 and 18, implicitly acknowledging that FCE was authorized to use the DD method. To be sure, that argument was to rebut FCE's assertion that it was limited in its selection of the method to be used, but it overlooks FCE's allegation that notified the County that proceeding under "the methods expressly designated in the Contract Document could result in damage or misalignment of the steel cases and/or cause damage to Route 11, the County directed FCE to perform the work as set forth in the Contract Documents, including as shown on Drawing C-09." Compl. ¶ 23.

 The Contract is not without ambiguity. Were the Court to consider the June Bid Form at this stage of the proceeding, the ambiguity is not clarified because it does not prescribe any method. With respect to the May Bid Form, see above. The drawing shows one method, § 1270 approves three methods (four if VDOT approves of the OC method), and, considering the County's argument regarding ¶ 13 of Addendum 1, one wonders why the provision even mentioned the Route 11 Crossing, given that C09 did not designate the DD method or HDPE pipe for use at that location. That is, why include the Route 11 Crossing when it did not meet the criteria for permission to use the OC method?

 The Supreme Court of Virginia has consistently held that a contract is ambiguous when "it refers to two or more things at the same time." *See, e.g., Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632 (2002) (quoting *Granite State Ins. Co. v. Bottoms,* 243 Va. 228, 234

(1992)). Furthermore, the Court determined in *Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc.*, 200 Va. 593 (1959), that a contract for building floodlights at a public park was ambiguous. *Id.* at 596. As such, the Court overruled a demurrer because it was improper for the trial court to resolve the ambiguity at the demurrer stage. *Id.* Such a ruling undoubtedly reflects that the jury ought to resolve contractual ambiguity. *See, e.g., Vega v. Chattan Associates, Inc.*, 246 Va. 196 (1993) (noting that, due to "seemingly conflicting provisions" in a contract, it was "for the jury to resolve" the apparent ambiguity through parol evidence). Similarly, the apparent conflict and ambiguity in this Contract should be resolved, not by this Court on demurrer, but rather by the fact-finder at trial.

Nevertheless, the County argues that the Contract is not ambiguous for two reasons, both of which are unpersuasive.

First, regarding § 1270 of the Unit Prices, the County notes that ¶ 1.2 states that the Unit Prices are administrative and procedural and argues that the Court should not consider this section as part of the design specifications. Paragraph 1.2 is not included in the Complaint; instead, it would only enter the Complaint if the Court were to include the full Unit Prices as the County urges in its motion to crave oyer. *See* Defendant's Memorandum in Support of MCO, Exhibit P. I rejected this motion above, but even if the Court granted this motion, the County's argument still fails. Although ¶ 1.2 indicates that section 1270 includes "administrative and procedural requirements for unit prices," ¶ 1.1 incorporates into the Unit Prices all drawings and general provisions of the Contract, including design specifications. In addition, ¶ 1.4A notes that Unit Prices include all necessary material plus other costs, including *installation* costs. Thus, the Unit Prices contemplate, to some degree, the method of installation. As a result, ¶ 1.2 does not resolve the ambiguity regarding the required installation method. Although the County's construction of the Unit Prices may be correct, such a determination is best left until after a more comprehensive presentation of the evidence.

Second, assuming that § 1270 of the Unit Prices enabled FCE to choose among a number of installation methods, the County contends that FCE should bear the risk of such a choice. The County argues that, if FCE believed the J&B or the DD methods were dangerous, it could have obtained VDOT permission to use open cut. Indeed, it (or someone) did eventually obtain VDOT permission because FCE ultimately installed the line at the Route 11 Crossing using the OC method. But this argument does not address the issue of whether the Contract is ambiguous. Instead, the County ties this argument to the implicit waiver issue, discussed below, by citing *Spearin* and *Southgate, infra.* Thus, I fail to see how this argument addresses the Contract's ambiguity. Instead, this argument relates more to the substance of the case rather than to the sustainability of the Complaint attacked by the Demurrer.

*2. Did FCE Make Any Implicit Warranty Regarding the Subsurface
Conditions at the Route 11 Crossing?*

The June Bid Form includes a list of representations and warranties FCE made regarding the Route 11 line. FCE stated that it (1) visited the site of the work and was satisfied by its general conditions; (2) studied all reports and tests of subsurface conditions; (3) studied all reports and tests of the site that may affect the cost of construction; and (4) did not believe that any further reports and tests were needed. These representations, the County argues, torpedo the argument that FCE encountered subsurface conditions materially different from the County's reports.

The County's argument is in direct conflict with the doctrine established by *United States v. Spearin,* 248 U.S. 132 (1918). Spearin contracted to build a dry dock at the Brooklyn Naval Yard in accordance with plans and specifications prepared by the government. Pursuant to the plans, Spearin moved a sewer to make way for the dry dock. Spearin moved the sewer to a location specified by the government, but the government was unaware that a dam sat adjacent to the new location of the sewer. After heavy rainfall, the dam funneled water into the sewer, which caused it to burst and to flood the excavation of the dry dock. Spearin then informed the government that he would not resume work unless the government fixed the problem or assumed responsibility for the damage that occurred. *Id.* at 133–35.

At trial, the government contended that Spearin, by agreeing to construct the dry dock, implicitly warranted to be responsible for all unforeseen difficulties. The U.S. Supreme Court, however, concluded that "if the contractor is bound to build according to plans or specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136. In essence, the government had to bear the fruit of its poorly devised plan. The Court further stated that the government was responsible for the unforeseen consequences even though Spearin agreed to "examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." *Id.* at 137.

The Supreme Court of Virginia adopted the *Spearin* doctrine in *Southgate v. Sanford & Brooks Co.,* 147 Va. 554, 563–64 (1927), but modified it in *Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, Inc.,* 200 Va. 593 (1953). In *Greater Richmond,* the Court determined that *Spearin* applies absent an "express guarantee or warranty by [the contractor] as to [the plan's] being sufficient and free from defects." *Id.* at 597. Thus, *Spearin* can be overcome only when the contractor expressly warrants that the plans and specifications are free from error.

Here, FCE agreed to "visit" the site and "study" the plans to determine if it could perform the work for the price it included in its bid. This language is substantially similar to the language in *Spearin,* which required the contractor to "examine" the site and "check up" the plans.

*Spearin,* 248 U.S. at 137. The County argues that this case is similar to *Modern Continental South v. Fairfax County Water Auth.,* 72 Va. Cir. 268 (2008), in which the Court found that, due to certain representations and warranties, a contractor was required to pay for certain flaws in design specifications. That case, however, falls within the exception carved out in *Greater Richmond* because the contractor there warranted to "verify" all details of the specifications and "notify" the engineer of all "errors, omissions, conflicts, and discrepancies." *Id.* at 272. But the language in FCE's warranty, to "visit" the site and "study" the plans, falls well short of a warranty to *verify* the plans.

In addition, the County fails to recognize that the Supreme Court of Virginia rejected this very argument in *Asphalt Roads & Materials Co. v. Department of Transp.,* 257 Va. 452 (1999). Similar to the Contract here, the contract in that case contained both a change in conditions clause and a warranty stating that the contractor had examined the site, plans, and specifications and that he was satisfied with the site's general condition. *Id.* at 459. The court determined that the more specific change in conditions clause controlled over the more general "examine the site" warranty. *Id.* 459–60. In addition, allowing the warranty to control would make the language in the change in condition clause meaningless. *Id.* at 459. Thus, the warranty does not preclude FCE's ability to seek additional compensation under the change in condition clause.

Although not part of the pleadings, there is some indication that there is a change in conditions clause in this Contract. Without relying on that as a fact, but given the possibility of such a provision, it is probably worth noting the case of *Asphalt Roads & Materials Co. v. Department of Transp.,* 257 Va. 452 (1999). The contract in that case contained both a change in conditions clause and a warranty stating that the contractor had examined the site, plans, and specifications and that he was satisfied with the site's general condition. *Id.* at 459. The Court determined that the more specific change in conditions clause controlled over the more general "examine the site" warranty. *Id.* 459–60. In addition, allowing the warranty to control would make the language in the change in condition clause meaningless. *Id.* at 459.

### III. *Conclusion*

The Court grants the County's MCO regarding the signed June Bid Form, but denies it as to the other documents. The Court overrules the County's Demurrer.